**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARK SMILOW and DEVORAH SMILOW, individually, and on behalf of similarly situated consumers,<br><br>                    Plaintiffs,<br><br>              v.<br><br>SANTANDER BANK, NATIONAL ASSOCIATION,<br>                    Defendant. | Civil Action No:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

GLOSSARY .................................................................................................................... iii

CHRONOLOGY ............................................................................................................ iv

TABLE OF EXHIBITS .................................................................................................. vi

I.      NATURE AND SUMMARY OF THE ACTION.............................................. 1

II.     JURISDICTION AND VENUE.......................................................................... 4

III.    THE PARTIES.................................................................................................... 4

        A.      Plaintiffs ................................................................................................

        B.      Defendant ................................................................................................ 4

IV.     SUBSTANTIVE ALLEGATIONS .................................................................... 5

        A.      The HELOC Terms................................................................................. 5

        B.      Relevant Changes to the Prime Rate...................................................... 6

        C.      Santander Bills Inflated Interest Charges Notwithstanding the Fed's Reduction in the Federal Funds Rate and Publication of the New Lower Prime Rate in The Wall Street Journal Money Rates Table ................................................................. 7

D.      Santander Fails to Credit Inflated Interest Payments to Principal ......................... 9

**V.    ADDITIONAL SCIENTER ALLEGATIONS**...............................................................**10**

**VI.   CLASS ACTION ALLEGATIONS** ...........................................................................**11**

**VII.  CAUSES OF ACTION** ................................................................................**14**

**VIII. PRAYER FOR RELIEF**...........................................................................**25**

**IX.   JURY TRIAL DEMAND** ..........................................................................**26**

**GLOSSARY**

| Term | Definition |
|---|---|
| **Adjustment Frequency** | Rate and interest charge may change monthly |
| **APR** | annual periodic rate |
| **Average Daily Balance** | The sum of the daily balances for the billing cycle divided by the number of days in the billing cycle |
| **Daily Periodic Rate** | (Prime Rate + Margin) / 365 (days in year) |
| **HELOC** | Home Equity Line of Credit Agreement |
| **Index** | Highest U.S. Prime Rate published in the Money Rates table of The Wall Street Journal on the first business day of the calendar month |
| **Margin** | Margin (e.g., 0.500%) added to Prime Rate |
| **Minimum Payment** | The minimum payment required to be made by the borrower |
| **Monthly Interest Charge** | Average daily balance × days in billing cycle × daily Periodic Rate |
| **New APR** | Daily Periodic Rate × 365 |
| **Periodic Finance Charge** | The monthly interest charge computed by multiplying the average daily balance by the "daily periodic rate." |
| **Preferred Rate Reduction** | Reduction given to the borrower when automatic payment of the Minimum Payments are authorized to be taken from certain of the borrower's accounts |
| **Prime Rate Change** | New Prime Rate published (first business day of month) |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

**CHRONOLOGY**

| Date | Event |
|---|---|
| Oct. 1, 2013 | Class Period begins. |
| Sept. 18, 2024 | Federal Reserve cuts the federal funds rate by 50 basis points (0.5%) to a new range of 4.75%–5.0%, first interest rate reduction since March 2020 |
| Sept. 18, 2024 | Santander Bank announces that "it has lowered its prime rate from 8.50% to 8.00% effective September 18, 2024." |
| Sept. 19, 2024 | WSJ Publishes New Money Rates Table with New Prime Rate of 8.00% |
| Oct. 19, 2024 | Santander Misdescribes and Overbills Interest Allegedly Owed Based on Pre-September 2024 Prime Rate |
| Nov. 19, 2024 | Santander Misapplies Payment Made |
| Nov. 7, 2024 | Federal Reserve cuts the federal funds rate by 25 basis points (0.25%) to a new range of 4.50% – 4.75% |
| Nov. 7, 2024 | Santander Bank announces that "it has lowered its prime rate from 8.00% to 7.75% effective November 7, 2024." |
| Nov. 8, 2024 | WSJ Publishes New Money Rates Table with New Prime Rate of 7.75% |
| Dec. 19, 2024 | Santander Misdescribes and Overbills Interest Allegedly Owed Based on Pre-November 2024 Prime Rate |
| Jan. 19, 2025 | Santander Misapplies Payment Made |
| Dec. 18, 2024 | Federal Reserve cuts the federal funds rate by 25 basis points (0.25%) to a new range of 4.25% – 4.50% |
| Dec. 18, 2024 | Santander Bank announces that "it has lowered its prime rate from 7.75% to 7.50% effective December 18, 2024." |
| Dec. 19, 2024 | WSJ Publishes New Money Rates Table with New Prime Rate of 7.50% |
| Jan. 19, 2025 | Santander Misdescribes and Overbills Interest Allegedly Owed Based on Pre-December 2024 Prime Rate |
| Feb. 19, 2025 | Santander Misapplies Payment Made |
| Sept. 17, 2025 | Federal Reserve cuts the federal funds rate by 25 basis points (0.25%) to a new range of 4.00% – 4.25% |
| Sept. 17, 2025 | Santander Bank announces that "it has lowered its prime rate from 7.50% to 7.25% effective September 17, 2025." |
| Sept. 18, 2025 | WSJ Publishes New Money Rates Table with New Prime Rate of 7.25% |
| Oct. 19, 2025 | Santander Misdescribes and Overbills Interest Allegedly Owed Based on Pre-September 2025 Prime Rate |
| Oct. 29, 2025 | Federal Reserve cuts the federal funds rate by 25 basis points (0.25%) to a new range of 3.75% – 4.00% |
| Oct. 29, 2025 | Santander Bank announces that "it has lowered its prime rate from 7.25% to 7.00% effective October 29, 2025." |

## CHRONOLOGY

| Date | Event |
|---|---|
| Oct. 30, 2025 | WSJ Publishes New Money Rates Table with New Prime Rate of 7.00% |
| Nov. 19, 2025 | Santander Misdescribes and Overbills Interest Allegedly Owed Based on Pre-October 2025 Prime Rate and Santander Misapplies Payment Made |
| Dec. 10, 2025 | Federal Reserve cuts the federal funds rate by 25 basis points (0.25%) to a new range of 3.50% – 3.75% |
| Dec. 10, 2025 | Santander Bank published a press release announces that "it has lowered its prime rate from 7.00% to 6.75% effective December 10, 2025." |
| Dec. 11, 2025 | WSJ Publishes New Money Rates Table with New Prime Rate of 6.75% |
| Jan. 19, 2026 | Santander Misdescribes and Overbills Interest Allegedly Owed Based on Pre-December 2025 Prime Rate |
| Feb. 19, 2026 | Santander Misapplies Payment Made |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

v

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---|---|
| **Exhibit A** | Santander Standard Form HELOC (personal information redacted) |
| **Exhibit B** | October 19, 2024 HELOC Statement (personal information redacted) |
| **Exhibit B-1** | November 19, 2024 HELOC Statement (personal information redacted) |
| **Exhibit C** | December 19, 2024 HELOC Statement (personal information redacted) |
| **Exhibit D** | January 19, 2025 HELOC Statement (personal information redacted) |
| **Exhibit D-1** | February 19, 2025 HELOC Statement (personal information redacted) |
| **Exhibit E** | October 19, 2025 HELOC Statement (personal information redacted) |
| **Exhibit F** | November 19, 2025 HELOC Statement (personal information redacted) |
| **Exhibit F-1** | December 19, 2025 HELOC Statement (personal information redacted) |
| **Exhibit G** | January 19, 2026 HELOC Statement (personal information redacted) |
| **Exhibit G-1** | February 19, 2026 HELOC Statement (personal information redacted) |
| **Exhibit H** | Santander Bank announces "it has lowered its prime rate from 8.50% to 8.00% effective September 18, 2024." |
| **Exhibit I** | Santander Bank announces "it has lowered its prime rate from 8.00% to 7.75% effective November 7, 2024." |
| **Exhibit J** | Santander Bank announces "it has lowered its prime rate from 7.75% to 7.50% effective December 18, 2024." |
| **Exhibit K** | Santander Bank announces "it has lowered its prime rate from 7.50% to 7.25% effective September 17, 2025." |
| **Exhibit L** | Santander Bank announces "it has lowered its prime rate from 7.25% to 7.00% effective October 29, 2025." |
| **Exhibit M** | Santander Bank announces "it has lowered its prime rate from 7.00% to 6.75% effective December 10, 2025." |

## I. NATURE AND SUMMARY OF THE ACTION

1. This federal class action is brought on behalf of all persons or entities who entered into a Home Equity Line of Credit Agreement ("HELOC") with Santander and/or had a HELOC that was administered by Santander between at least October 1, 2013, through the present and who were damaged through Santander's pattern of conduct that fraudulently, repeatedly, and unlawfully inflated the amount of interest owing and billed in violation of the terms of the HELOCs, Truth in Lending Act ("TILA"), Article 22-A of the General Business Law ("NYGBL"), and common law.

2. Defendant Santander facilitated this scheme by dunning HELOC customers with deceptive documentation that inflated and overbilled interest charges and misapplied the payment of those charges to customers' accounts with the expectation that customers, Plaintiffs and the Class, would blindly pay their bills as a rubber stamp, without even noticing the fraudulent billing.

3. Santander is an American bank operating as a wholly owned subsidiary of the Spanish Santander Group. It is based in Boston and its principal market is the northeastern United States. It has $57.5 billion in deposits, operates about 650 retail banking offices and over 2,000 ATMs, and employs approximately 9,800 people. It offers an array of financial services and products, including retail banking, mortgages, corporate banking, cash management, credit card, capital markets, trust and wealth management, and insurance.

4. A HELOC is line of credit, similar to a credit card, that lets homeowners choose how much money to borrow, up to a certain limit, during a designated timeframe called the draw period, except that the homeowner borrows against the equity of the home, unlike a credit card, which is not secured by the home. During the draw period, the homeowner pays only interest at a variable rate, without repaying principal. Similar to a credit card, when payments are made on the HELOC, the amount of available credit is replenished. HELOCs usually have adjustable interest

1

rates and the payment will vary depending on the outstanding balance. At the end of the draw period, the homeowner enters into the repayment period, usually for 10 to 20 years, during which the homeowner pays back both principal and interest.

5.    Santander employed a standard form document agreement for all of its HELOC customers. This agreement provided the terms for the calculation of the payment of monthly interest (called the "Periodic Finance Charge") for the outstanding principal balance on any given HELOC determined by several provisions in the loan documents, which accounted for different scenarios and options available to the borrower. *First*, the monthly interest charge is determined with reference to the "average daily balance" outstanding on the HELOC. For each billing cycle, the beginning balance of the account each day is added to any new advances, and payments or credits and any unpaid finance charges are subtracted. This gives the "daily balance." All daily balances for the billing cycle are then summed and divided by the number of days in the billing cycle, producing the "average daily balance."

6.    *Second*, the Periodic Finance Charge is then computed by multiplying the average daily balance by the number of days in the billing cycle and then by the "daily periodic rate."

7.    The "daily periodic rate" (and corresponding annual periodic rate or "APR") is variable and determined monthly. The daily periodic rate is based on the highest U.S. Prime Rate published in the Money Rates table of The Wall Street Journal (the "Index") on the first business day of the calendar month, and divided by the number of days in the year.

8.    *Third*, after the Index is determined, the "daily periodic rate" is adjusted higher by the "Margin," which is typically 0.500% percentage points.

9.    *Fourth,* the Index as adjusted by the Margin is then further revised when the Prime Rate changes. Changes in the Prime Rate result in a corresponding change in the monthly interest charge, as the APR is recalculated each month based on the updated Prime Rate plus the applicable

margin, subject to the minimum and maximum APR limits set in the agreement. Hence, the formulaic presentation of the monthly interest only charge for the HELOC during the draw period is: Average Daily Balance X Daily Periodic Rate = (Index + Margin) / 365, subject to the Preferred Rate Reduction,[1] if any.

10. As more fully set forth herein, Defendant violated the HELOC terms, TILA, NYGBL, and common law throughout the Class Period by repeatedly charging the members of the Class inflated interest and misapplying the payments thereof. This is so because Defendant knowingly failed to reduce the Daily Periodic Rate consistent with the terms of the HELOC when the Index was lowered.

11. Specifically, the HELOC Agreement expressly requires Defendant to use the Index value available on the first business day of each calendar month when determining the Daily Periodic Rate and corresponding APR. Instead, Defendant determines the Daily Periodic Rate and APR using the Index value in effect at the beginning of its billing cycle, resulting in inflated interest charges whenever the Prime Rate is reduced.

12. The HELOC Agreement does not provide that APR adjustments are determined using Defendant's billing cycle.

13. Notwithstanding the legal requirements obligating Defendant to timely lower the Index and corresponding index charges upon a reduction in the Index as published by the Money Rates table of The Wall Street Journal, Defendant dunned the members of the Class with an inflated Index and corresponding inflated interest charges by sending documentation it knew would not be scrutinized by Plaintiffs and the Class members at the level required to uncover

---

[1] The Preferred Rate Reduction, if any, is a reduction given to the borrower when automatic payment of the Minimum Payments are authorized to be taken from the borrower's Santander checking account, which may reduce the rate paid by 0.50 percentage points when paid from a Santander Select checking account or 0.25 percentage points when paid from other Santander checking accounts.

3

Defendant's deceit. Defendant was, therefore, able to reap the rewards of this crafty deception by receiving millions of dollars more than was otherwise owed in interest had the interest charges been computed and described correctly on the documentation.

14.    Plaintiffs and the Class have suffered significant damages as a direct and proximate result of Defendant's violations of law and other fraudulent behavior.

## II.    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 & 1337, 15 U.S.C. § 1640(e), and with regard to the New York state law claims, pursuant to 28 U.S.C. § 1367.

16.    Venue is proper in this District since many of the acts and conduct complained of occurred and had an effect in this District.

17.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the Internet.

## III.    THE PARTIES

### A.    Plaintiffs

18.    Plaintiff Mark Smilow is a resident of Kings County, New York, and is a consumer as that term is defined by 12 C.F.R. § 1026.2(a)(11). Mr. Smilow has a HELOC with Defendant.

19.    Plaintiff Devorah Smilow is a resident of Kings County, New York, and is a consumer as that term is defined by 12 C.F.R. § 1026.2(a)(11). Mrs. Smilow has a HELOC with Defendant.

### B.    Defendant

20.    Defendant Santander is a Boston headquartered American bank operating as a wholly owned subsidiary of the Spanish Santander Group. Its principal place of business is at 75

4

State Street, Boston, Massachusetts. It has several branches in this jurisdiction. It regularly attempts to collect debts alleged to be due.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    The HELOC Terms

21.    On or about December 20, 2017, Plaintiffs entered into a standard form HELOC with Santander in Kings County, New York. Exhibit A.

22.    The HELOC provides that monthly interest upon the principal borrowed will be calculated using the average daily balance method multiplied by the applicable daily Periodic Rate.

23.    First, the "average daily balance" method is employed each billing cycle to determine the principal amount borrowed upon which interest is charged. The HELOC provides that the beginning balance of the account each day is added to any new advances, and payments or credits and any unpaid finance charges are subtracted, yielding the "daily balance." Then the daily balances for the billing cycle are summed and divided by the number of days in the billing cycle to get the "average daily balance."

24.    Next, according to the HELOC, the monthly interest charge (the "Periodic Finance Charge") is calculated by multiplying the number of days in the billing cycle by the "average daily balance" and then multiplying that product by the daily Periodic Rate.

25.    The daily Periodic Rate is determined each month by starting with the most recent U.S. Prime Rate published in the Money Rates table of The Wall Street Journal on the first business day of the calendar month and adjusting the U.S. Prime Rate by the margin, which is then divided by the number of days in the year, yielding the daily Periodic Rate. The daily Periodic Rate is then multiplied by the number of days in the year to get the Annual Percentage Rate ("APR"). Hence, the daily Periodic Rate = (Index + Margin) / 365 and the APR = Daily Periodic Rate × 365.

26.     The following table summarizes the steps detailing how changes to the Prime Rate affect the monthly interest charge as specifically detailed in the HELOCs:

| Step | Description |
|---|---|
| 1. Prime Rate Change | New Prime Rate published (first business day of month) |
| 2. Margin Added | Margin (*e.g.,* 0.500%) added to Prime Rate |
| 3. Daily Periodic Rate | (Prime Rate + Margin) / 365 (days in year) |
| 4. New APR | Daily Periodic Rate × 365 |
| 5. Monthly Interest Charge | Average daily balance × days in billing cycle × daily Periodic Rate |
| 6. Adjustment Frequency | Rate and interest charge may change monthly |

27.     Hence, the Periodic Rate charged and the corresponding APR will increase or decrease according to the Prime Rate effective during the first day of the calendar month in which the new Prime Rate is used, pursuant to Exhibit A.

28.     At all relevant times hereto, the Margin in Plaintiff's HELOC was and continues to be 0.500 percentage points.

**B.     Relevant Changes to the Prime Rate**

29.     Below is a chart reflecting the changes to the U.S. Prime Rate correlating to the changes instituted by the Federal Reserve to the Federal Funds Rate since January 1, 2024, and the publication of changes thereto in the Money Rates table of The Wall Street Journal:

| Date | FOMC[2] Action | Federal Funds Target Range | New Prime Rate | WSJ Print Publication |
|---|---|---|---|---|
| Sept. 18, 2024 | Cut (-50 bps) | 4.75% – 5.00% | 8.00% | Sept. 19, 2024 |
| Nov. 7, 2024 | Cut (-25 bps) | 4.50% – 4.75% | 7.75% | Nov. 8, 2024 |
| Dec. 18, 2024 | Cut (-25 bps) | 4.25% – 4.50% | 7.50% | Dec. 19, 2024 |
| Sept. 17, 2025 | Cut (-25 bps) | 4.00% – 4.25% | 7.25% | Sept. 18, 2025 |
| Oct. 29, 2025 | Cut (-25 bps) | 3.75% – 4.00% | 7.00% | Oct. 30, 2025 |
| Dec. 10, 2025 | Cut (-25 bps) | 3.50% – 3.75% | 6.75% | Dec. 11, 2025 |

---

[2] FOMC stands for the Federal Open Market Committee, the branch of the Federal Reserve that sets interest rates.

6

**C.**     **Santander Bills Inflated Interest Charges Notwithstanding the Fed's Reduction in the Federal Funds Rate and Publication of the New Lower Prime Rate in The Wall Street Journal Money Rates Table**

30.     On or about October 19, 2024, more than one month after the Federal Reserve reduced the Federal Funds Target Range by 50 basis points to the Federal Funds Target Range of 4.75% – 5.00% and after The Wall Street Journal published the new Money Rates Table prior to October 1, 2024, with the new Prime Rate of 8.00%, as set forth in ¶ 27, *supra*, Santander overbilled Plaintiffs—in blatant breach of the HELOC terms, TILA, NYGBL, and common law— by the old interest rate of 9.00% with the corresponding inflated Daily Periodic Rate of 0.0002459016, instead of the 8.50% interest rate required under the terms of the HELOC. Exhibit B.

31.     On or about December 19, 2024, more than one month after the Federal Reserve reduced the Federal Funds Target Range by 25 basis points to the Federal Funds Target Range of 4.50% – 4.75% and after The Wall Street Journal published the new Money Rates Table prior to December 1, 2024, with the new Prime Rate of 7.75%, as set forth in ¶ 27, *supra*, Santander overbilled Plaintiffs—in blatant breach of the HELOC terms, TILA, NYGBL, and common law— by the old interest rate of 8.50% with the corresponding inflated Daily Periodic Rate of 0.0002322404, instead of the 8.25% interest rate required under the terms of the HELOC. Exhibit C.

32.     On or about January 19, 2025, more than one month after the Federal Reserve reduced the Federal Funds Target Range by 25 basis points to the Federal Funds Target Range of 4.25% – 4.50% and after The Wall Street Journal published the new Money Rates Table prior to January 1, 2025, with the new Prime Rate of 7.50%, as set forth in ¶ 27, *supra*, Santander overbilled Plaintiffs—in blatant breach of the HELOC terms, TILA, NYGBL, and common law—by the old interest rate of 8.25% with the corresponding inflated Daily Periodic Rate of 0.0002254098 for the

7

period between December 20, 2024, and December 31, 2024, and with the corresponding inflated Daily Periodic Rate of 0.0002260273 for the period between January 1, 2025, and January 19, 2025, instead of the 8.00% interest rate required under the terms of the HELOC. Exhibit D.

33.     On or about October 19, 2025, more than one month after the Federal Reserve reduced the Federal Funds Target Range by 25 basis points to the Federal Funds Target Range of 4.00% – 4.25% and after The Wall Street Journal published the new Money Rates Table prior to October 1, 2025, with the new Prime Rate of 7.25%, as set forth in ¶ 27, *supra*, Santander overbilled Plaintiffs—in blatant breach of the HELOC terms, TILA, NYGBL, and common law— by the old interest rate of 8.00% with the corresponding inflated Daily Periodic Rate of 0.0002191781, instead of the 7.75% interest rate required under the terms of the HELOC. Exhibit E.

34.     On or about November 19, 2025, several weeks after the Federal Reserve reduced the Federal Funds Target Range by 25 basis points to the Federal Funds Target Range of 3.75% – 4.00% and after The Wall Street Journal published the new Money Rates Table prior to or on November 1, 2025, with the new Prime Rate of 7.00%, as set forth in ¶ 27, *supra*, Santander overbilled Plaintiffs—in blatant breach of the HELOC terms, TILA, NYGBL, and common law— by the old interest rate of 7.75% with the corresponding inflated Daily Periodic Rate of 0.0002123288, instead of the 7.50% interest rate required under the terms of the HELOC. Exhibit F.

35.     On or about January 19, 2026, more than one month after the Federal Reserve reduced the Federal Funds Target Range by 25 basis points to the Federal Funds Target Range of 3.50% – 3.75% and after The Wall Street Journal published the new Money Rates Table prior to or on January 1, 2026, with the new Prime Rate of 6.75%, as set forth in ¶ 27, *supra*, Santander overbilled Plaintiffs—in blatant breach of the HELOC terms, TILA, NYGBL, and common law—

8

by the old interest rate of 7.50% with the corresponding inflated Daily Periodic Rate of 0.0002054795, instead of the 7.25% interest rate required under the terms of the HELOC. Exhibit G.

36.    Hence, the following chart reflects the difference between what Santander was required to bill for interest APR (inclusive of the margin) and what it actually billed:

| Statement Date | Prime Rate | Margin | Contract APR | APR Charged by Santander | Difference |
|---|---|---|---|---|---|
| Oct. 19, 2024 | 8.00% | 0.50% | 8.50% | 9.00% | +0.50% |
| Dec. 19, 2024 | 7.75% | 0.50% | 8.25% | 8.50% | +0.25% |
| Jan. 19, 2025 | 7.50% | 0.50% | 8.00% | 8.25% | +0.25% |
| Oct. 19, 2025 | 7.25% | 0.50% | 7.75% | 8.00% | +0.25% |
| Nov. 19, 2025 | 7.00% | 0.50% | 7.50% | 7.75% | +0.25% |
| Jan. 19, 2026 | 6.75% | 0.50% | 7.25% | 7.50% | +0.25% |

**D.    Santander Fails to Credit Inflated Interest Payments to Principal**

37.    On November 19, 2024, Defendant mailed another bill to Plaintiffs. This bill reflects Defendant's failure to credit to principal the payment made by Plaintiffs the prior month in the amount over and above the amount permitted to be charged as interest under the terms of the HELOC. Exhibit B-1.

38.    On January 19, 2025, Defendant mailed another bill to Plaintiffs. This bill reflects Defendant's failure to credit to principal the payment made by Plaintiffs the prior month in the amount over and above the amount permitted to be charged as interest under the terms of the HELOC. Exhibit D.

39.    On February 19, 2025, Defendant mailed another bill to Plaintiffs. This bill reflects Defendant's failure to credit to principal the payment made by Plaintiffs the prior month in the amount over and above the amount permitted to be charged as interest under the terms of the HELOC. Exhibit D-1.

40.     On November 19, 2025, Defendant mailed another bill to Plaintiffs. This bill reflects Defendant's failure to credit to principal the payment made by Plaintiffs the prior month in the amount over and above the amount permitted to be charged as interest under the terms of the HELOC. Exhibit F.

41.     On December 19, 2025, Defendant mailed another bill to Plaintiffs. This bill reflects Defendant's failure to credit to principal the payment made by Plaintiffs the prior month in the amount over and above the amount permitted to be charged as interest under the terms of the HELOC. Exhibit F-1.

42.     On February 19, 2026, Defendant mailed another bill to Plaintiffs. This bill reflects Defendant's failure to credit to principal the payment made by Plaintiffs the prior month in the amount over and above the amount permitted to be charged as interest under the terms of the HELOC. Exhibit G-1.

## V.    ADDITIONAL SCIENTER ALLEGATIONS

43.     Defendant acted with scienter in overbilling Plaintiffs and the Class for interest at a higher rate than the Index. This is so because immediately after the Federal Reserve reduced the Federal Funds Target Range and after the Wall Street Journal published the new Money Rates Table in response thereto for each of the periods listed in ¶ 27, *supra*, Defendant published a press release announcing its new Prime Rate corresponding to the foregoing.

44.     For example, on September 18, 2024, Santander Bank published a press release announcing that "it has lowered its prime rate from 8.50% to 8.00% effective September 18, 2024." Exhibit H.

45.     Similarly, on November 7, 2024, Santander Bank published a press release announcing that "it has lowered its prime rate from 8.00% to 7.75% effective November 7, 2024." Exhibit I.

10

46. On December 18, 2024, Santander Bank again published a press release announcing that "it has lowered its prime rate from 7.75% to 7.50% effective December 18, 2024." Exhibit J.

47. And on September 17, 2025, Santander Bank published a press release announcing that "it has lowered its prime rate from 7.50% to 7.25% effective September 17, 2025." Exhibit K.

48. Again on October 29, 2025, Santander Bank published a press release announcing that "it has lowered its prime rate from 7.25% to 7.00% effective October 29, 2025." Exhibit L.

49. Finally, on December 10, 2025, Santander Bank published a press release announcing that "it has lowered its prime rate from 7.00% to 6.75% effective December 10, 2025." Exhibit M.

50. Hence, Defendant was fully aware and conscious of the reductions in the corresponding Index that it was required to adjust before dunning Plaintiffs and members of the Class for the interest on the bills that it sent Plaintiffs and the members of Class after the Index was lowered. Nevertheless, Defendant overcharged for interest in the bills it sent to Plaintiffs and the Class after the Index was adjusted lower. Defendant was motivated to artificially inflate the interest rate charged to HELOC customer because doing so allowed Santander to profit handsomely without Class members even realizing that they were being overcharged.

VI.   CLASS ACTION ALLEGATIONS

51. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons and entities having a Santander HELOC and suffering damages by virtue of Santander's overbilling of interest in breach of the terms of the HELOC agreement and in violation of TILA, NYGBL, and common law.

52. Plaintiffs seek certification of the following classes, initially defined as follows:

**National Class**: All consumers in the United States who entered into a variable-rate Home Equity Line of Credit ("HELOC") agreement with Defendant Santander Bank, N.A., or

11

whose HELOC agreement was administered or serviced by Defendant Santander Bank, N.A., and who, during the period from October 1, 2013 through the present (the "Class Period"), were billed a monthly interest charge or periodic finance charge calculated using an Index rate higher than the highest U.S. Prime Rate published in the Money Rates table of *The Wall Street Journal* on the first business day of the applicable calendar month.

**New York Subclass**: All consumers residing in the State of New York who entered into a variable-rate Home Equity Line of Credit ("HELOC") agreement with Defendant Santander Bank, N.A., or whose HELOC agreement was administered or serviced by Defendant Santander Bank, N.A., and who, during the Class Period, were billed a monthly interest charge or periodic finance charge calculated using an Index rate higher than the highest U.S. Prime Rate published in the Money Rates table of *The Wall Street Journal* on the first business day of the applicable calendar month.

53.     Excluded from the Classes is the Defendant named herein, members of their immediate families, any firm, trust, partnership, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendant(s), and the legal representatives, heirs, successors-in-interest or assigns of such excluded persons.

54.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members cannot be determined at this early stage, Plaintiffs believe that thousands of people had a Santander HELOC during the Class Period. Members of the Class may be identified from records maintained by Santander or its agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in class actions.

55.     Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and all members of the Class were similarly affected by Defendants' unlawful conduct as complained of herein.

56.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action litigation.  Plaintiffs have no interests that are contrary to or in conflict with those of the Class.

57.     Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, *inter alia*:

a)      Whether the laws were violated by Defendant's acts as alleged herein;

b)      Whether Defendant billed Plaintiffs and the members of the Class with materially deceptive documentation that improperly inflated the amount of interest owed;

c)      Whether Defendant misapplied payments made by Plaintiffs and the members of the Class;

d)      Whether Defendant overcharged Class members for interest during the Class Period; and

e)      Whether Class members have sustained damages, including punitive damages, costs, and/or attorneys' fees, and if so, the proper measure of damages.

58.     Plaintiffs know of no difficulty that will be encountered in the management of this action that would preclude its maintenance as a class action.

59.     A class action is superior to all other available methods for the fair and efficient adjudication of this action because, among other things, joinder of all members of the Class is

13

impracticable. In addition, since the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it nearly impossible for members of the Class to bring individual actions.

## VII.  CAUSES OF ACTION

### COUNT I

#### Violations of the Truth in Lending Act (15 U.S.C. § 1639f) and Reg Z (12 C.F.R. §§ 1026.7 and 1026.10)

60.     Plaintiffs re-allege each allegation above as if fully set forth herein.

61.     TILA and its implementing regulation, Regulation Z, 12 C.F.R. §§ 1026.7 and 1026.10, prohibit certain acts and practices and contain certain requirements relating to payment processing in connection "with a consumer credit transaction secured by a consumer's principal dwelling."

62.     "Consumer credit" as defined by Regulation Z, 12 C.F.R. § 1026.2(a)(12) means, "credit offered or extended to a consumer primarily for personal, family, or household purposes."

63.     "Credit" as defined by Regulation Z, 12 C.F.R. § 1026.2(a)(14) means "the right to defer payment of debt or to incur debt and defer its payment."

64.     A "dwelling" as defined by Regulation Z, 12 C.F.R. § 1026.2(a)(19), means a "residential structure that contains one to four units, whether or not that structure is attached to real property. The term includes an individual condominium unit, cooperative unit, mobile home, and trailer, if it is used as a residence."

65.     At all relevant times, Defendant regularly extended open-end consumer credit plans secured by consumers' principal dwellings within the meaning of TILA and Regulation Z, and was obligated to issue accurate monthly periodic statements and promptly credit payments.

66.     Plaintiffs are natural persons whose principal dwelling is secured by a security interest and are therefore "consumers" as that term is defined in 12 C.F.R. § 1026.2(a)(11).

14

Defendant is the creditor under the HELOC. Defendant regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments, and is the person to whom the obligation under the HELOC is initially payable. Defendant is therefore a "creditor" as that term is defined in 12 C.F.R. § 1026.2(a)(17).

67.    Regulation Z requires that Defendant provide borrowers with a monthly periodic statement or billing statement detailing information such as the amount due, how Defendant will break down and apply monthly payments, all payments received since the last statement, the total of all payments received since the beginning of the current calendar year, all transaction activity since the last statement, and the amount of payments in a suspense or unapplied funds account.

68.    Regulation Z further requires that Defendant promptly apply payments.

69.    In numerous instances, Defendant failed to send Plaintiffs and the Class periodic statements accurately detailing the foregoing required information. For example, Defendant failed to properly identify the Plaintiffs' required payments of interest on their HELOC loan, including, but not limited to, payments dunned in the bills sent to Plaintiffs on October 19 and December 19, 2024; January 19, October 19, and November 19, 2025; and January 19, 2026, see ¶¶ 30-35, *supra*, in violation of 15 U.S.C. § 1639f, 12 C.F.R. § 1026.7 and 12 C.F.R. § 1026.9.

70.    In addition, Defendant failed to credit one or more of the foregoing payments towards interest and principal at the time the payments were received nor within a reasonable time thereafter in accordance with the terms of the HELOC, including, but not limited to, payments reflected in the bills sent to Plaintiffs  on November 19; January 19, November 19, and December 19, 2025; and February 19, 2026, see ¶¶ 37-42, *supra*, in violation of 12 C.F.R. § 1026.7 and 12 C.F.R. § 1026.10.

71.    The acts and practices herein set forth were deceptive, misleading and fraudulent.

15

72.    Defendant had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

73.    As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiffs and the Class were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

74.    Plaintiffs and other Class members relied directly or indirectly on the false and misleading statements made by Defendant, and/or an absence of material adverse information that was known to Defendant or recklessly disregarded but not disclosed in Defendant's dunning letters.

75.    Plaintiffs and other Class members were damaged as a result of their reliance on the Defendants' false and/or misleading statements and misrepresentations and omissions of material facts.

76.    As a result of Defendant's failure to promptly credit Plaintiffs ' payments, Plaintiffs suffered actual damages. Plaintiffs are therefore entitled to recover actual damages from Defendant pursuant to 15 U.S.C. § 1640(a)(1).

77.    Defendant's actions and omissions render it liable for statutory damages pursuant to 15 U.S.C. § 1640(a)(2)(A)(i).

78.    Plaintiffs are entitled to recover costs and attorney's fees from Defendant pursuant to 15 U.S.C. § 1640(a)(3).

## COUNT II

### For Violations of N.Y. Gen. Bus. Law § 349

79.    Plaintiffs re-allege each allegation above as if fully set forth herein.

16

80.     Plaintiffs are New York consumers entitled to the protection afforded under NYGBL, entitled "Consumer Protection from Deceptive Acts and Practices."

81.     NYGBL § 349 provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York] are hereby declared unlawful."

82.     A NYGBL § 349 cause of action accrues when consumer-oriented conduct would be deceptive and materially misleading to a reasonable consumer and causes damages.

83.     Defendant's acts and omissions are directed at consumers and include, but are not limited to, sending documentation to Plaintiffs  and the other members of the Class, as described herein, that was fraudulent and misleading in that they were drafted, reviewed and sent without having the interest calculations contained therein confirmed as legally due and owing, in fact, they were illegally inflated the amount of monies due and owing to Defendant;

84.     The acts and practices herein set forth were deceptive, misleading and fraudulent. As a result of such practices, Plaintiffs and the other members of the Class were injured, suffered damages and are entitled to relief as provided for by NYGBL § 349(h).

**COUNT III**

**<u>Breach of Contract</u>**

85.     Plaintiffs re-allege each allegation above as if fully set forth herein.

86.     Plaintiffs and the Classes entry into the standard form HELOC agreement with Defendant, as set forth in ¶¶ 18-19, created a contract between the parties.

87.     Plaintiffs and the Class have duly performed all promises and obligations required of them and have satisfied all conditions under the HELOCs. Defendant has repeatedly and materially breached the HELOCs in several respects, including, but not limited to failing to

17

properly dun Plaintiffs and the Class for the proper amounts owing, and failing to promptly apply payments made as required by the HELOCs,

88.     Defendant's breaches have directly and proximately caused damage to Plaintiffs and the Class, including but not limited to, being overcharged for interest, having payments that were made by Plaintiffs and the Class misapplied to their accounts, damage to their credit score, attorney costs, fees, and expenses, inspection fees, late fees, loss of use of funds, and severe emotional distress.

89.     As a direct, proximate, and foreseeable result of the repeated and material breaches of the HELOCs, Plaintiffs and the Class have been damaged in an amount to be proven at trial, together with interest, costs, and attorney fees.

## COUNT IV

### Breach of the Covenant of Good Faith and Fair Dealing

90.     Plaintiffs re-allege each allegation above as if fully set forth herein.

91.     Plaintiffs' and Defendant's entry into the standard form HELOC agreement as set forth in ¶¶ 18-19 created a contract between the parties.

92.     Defendant knew that it was obligated to timely and accurately reduce the interest rate charged to Plaintiffs and the Class after each reduction by the Federal Reserve to the Federal Funds Rate and the publication of changes thereto in the Money Rates table of The Wall Street Journal.

93.     However, instead of complying with the contract terms, Defendant schemed to delay the timely and accurate reduction in the interest rate charged to Plaintiffs and the Class and, thereby, to misapply the payments made by Plaintiffs and the Class, in order to take advantage of Plaintiffs and the Class and to profit from the informational advantage that Defendant had.

94.     Defendant's failure to timely and accurately reduce in the interest rate charged to Plaintiffs and the Class and to correctly account for the payments made constitutes a violation of the covenant of good faith and fair dealing.

95.     As a result of Defendants' violations of good faith and fair dealing, Plaintiffs and the Class have suffered damages, have been supplied with misleading dunning letters, have been overcharged, and have had the payments that were made by Plaintiffs and the Class misapplied to their accounts.

## COUNT V

## Negligence

96.     Plaintiffs re-allege each allegation above as if fully set forth herein.

97.     Upon information and belief, Defendant maintains computer programs designed to calculate interest with the fraudulent method described herein.

98.     Defendant failed to take available, basic and necessary steps to properly calculate the interest amounts owed in the statements provided to Plaintiffs and Class members. Defendant assumed a duty to exercise reasonable skill in the performance of its work.

99.     Defendant, as a federally regulated institutional financial depository, owes a broad, independent administrative duty of care to the public and to Plaintiffs and Class members, separate and apart from the express text of the HELOC agreements, to maintain accurate, secure, and reliable automated billing and consumer account architectures.

100.    This independent duty arises from the special relationship inherent between a national banking association and consumers, wherein the bank maintains exclusive operational custody over the accounting ledger, automates the calculation of interest charges, and holds a position of superior informational and technical control over the processing of consumer funds.

19

101. Defendant breached this independent duty of care by maintaining, deploying, and failing to properly supervise a defective computer accounting program and automated billing system. In doing so, Defendant affirmatively launched a force or instrument of harm—namely, a flawed administrative infrastructure that systematically extracted unauthorized funds from consumer accounts without human oversight or programmatic verification.

102. Defendant knew, or should have known, that its failure to properly calculate the interest amount owed could lead to Plaintiffs and Class members being charged unlawful interest that vastly inflated the amounts purportedly owed to Defendant.

103. By reason of the foregoing, Defendant directly created and/or increased the risk of harm to Plaintiffs and the Class.

104. As a direct, proximate cause of the foregoing, Plaintiffs and the Class have been damaged in the total amount to be determined at trial.

## COUNT VI

### Gross Negligence

105. Plaintiffs re-alleges each allegation above as if fully set forth herein.

106. Defendant's failure to follow the basic and necessary protocols for the calculations of interest in the statements transmitted to Plaintiffs and the Class, Defendant manifested a reckless and intentional breach of its duty of care and a complete disregard for the rights of Plaintiffs and the Class.

107. Defendant's failure to implement basic automated checks or perform routine systems reconciliation between its public rate announcements and its consumer invoicing ledger constitutes a complete and reckless disregard for its core administrative obligations as an institutional depository.

108. Defendant possessed actual knowledge of the consecutive interest rate reductions and the errors their programs were exhibiting, yet manifested a conscious and intentional indifference to the rights of Plaintiffs and the Class by permitting its automated systems to continuous dun consumer accounts at inflated rates. This failure to act constitutes a major departure from the standard of care expected of a national banking institution handling consumer financial assets, rising to the level of gross negligence.

109. As a direct, proximate and foreseeable result of Defendant's gross negligence, Plaintiffs and the Class have been damaged.

## COUNT VII

### Unjust Enrichment

110. To the extent the Court or Defendant asserts that any aspect of the dispute is not fully governed by an enforceable express contract, Plaintiffs plead this Count in the alternative.

111. Plaintiffs re-allege each allegation above as if fully set forth herein.

112. Through Defendants' fraudulent interest calculations, Defendant received millions more than it was legally entitled, to the detriment of Plaintiffs and the Class.

113. Had the Defendant properly calculated the interest owed on the HELOCs, Plaintiffs and the Class would have paid lower interest than was actually paid.

114. Defendant has been unjustly enriched through these fraudulent activities. It is against equity and good conscience to permit Defendant to retain the benefits of the monies obtained without paying value to the Plaintiffs and the Class.

115. As a direct, proximate and foreseeable result of the Defendant's unjust enrichment, Plaintiffs and the Class have been damaged.

## COUNT VIII

### Conversion

21

116.    Plaintiffs re-allege each allegation above as if fully set forth herein.

117.    It is well settled that "[a] conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49-50 (2006) (emphasis added).

118.    Defendant intentionally, and without authority, assumed or exercised control over the surplus monies paid as interest by Plaintiffs and the Class.

119.    Defendant exercised an unauthorized dominion over the excess interest collected to the exclusion of Plaintiffs and the Classes right, such that Plaintiffs and the Class cannot recover the amount.

120.    As a direct, proximate and foreseeable result of the Defendant's conduct, Plaintiffs and the Class have been damaged.

## COUNT IX

### Common Law Fraud

121.    Plaintiffs re-allege each allegation above as if fully set forth herein.

122.    Defendant Santander routinely engineered, generated, and disseminated standardized monthly periodic billing statements to Plaintiffs and members of the Class that contained materially false representations of fact.

123.    Specifically, on the regular billing statements issued to Plaintiffs and the Class following Federal Reserve rate cuts—including but not limited to the statements dated October 19, 2024; December 19, 2024; January 19, 2025; October 19, 2025; November 19, 2025; and January 19, 2026—Defendant falsely represented that the interest charges billed were calculated in accordance with the index rate rules mandated by the HELOC agreement.

22

124.    These representations were false. Defendant was actively billing Plaintiffs and the Class using an inflated, obsolete Index rate that did not correspond to the highest U.S. Prime Rate published in the Money Rates table of *The Wall Street Journal* on the first business day of the applicable calendar month.

125.    Defendant possessed actual knowledge that these billing statements were false and deceptive. As set forth herein, immediately following each applicable Federal Reserve reduction, Defendant issued public corporate press releases celebrating its own lowered Prime Rate. Consequently, Defendant knew the exact lower rate required to be billed, yet intentionally permitted its automated consumer-facing billing architectures to generate invoices reflecting unadjusted, inflated interest amounts.

126.    Defendant generated and mailed these false invoices with the explicit intent to deceive Plaintiffs and the Class, and with the deliberate expectation that consumers would trust the accuracy of their institutional bank statements, blindly authorize the monthly minimum payments, and rubber-stamp the charges without uncovering Defendant's underlying mathematical manipulation.

127.    Plaintiffs and members of the Class reasonably and justifiably relied on the accuracy of Defendant's standardized financial invoices and billing statements when making their monthly payments. Plaintiffs and the Class had no reason to suspect a national banking association would systematically deviate from its own contractually mandated index rate formulas.

128.    As a direct and proximate result of Defendant's material misrepresentations and fraudulent invoicing practices, Plaintiffs and the Class were induced to overpay monthly interest charges, suffered the loss of use of their capital, and sustained significant pecuniary damages.

129.    Because Defendant's fraudulent billing practices were entirely automated and executed uniformly across a standardized consumer portfolio, Defendant's conduct targeted the

23

public at large and manifested a high degree of moral turpitude, entitling Plaintiffs and the Class to an award of punitive damages.

## COUNT X

### Breach of Special Administrative Relationship

130.    Plaintiffs re-allege each allegation above as if fully set forth herein.

131.    Under ordinary circumstances, a debtor-creditor relationship is contractual in nature. However, a special administrative and quasi-fiduciary relationship arose between Defendant and its HELOC customers because Defendant maintained exclusive operational custody over the account ledgers, held a position of superior technical control over the processing of consumer assets, and automated the monthly calculation of interest charges.

132.    Under the terms of the HELOC agreement and variable-rate lending protocols, Defendant stepped out of the role of a passive lender and assumed an exclusive principal-custody and bookkeeping role. Plaintiffs and the Class were entirely dependent on Defendant to faithfully monitor external financial indices, accurately adjust consumer portfolios based on that information, and promptly draw down principal balances upon payment.

133.    By virtue of this asymmetric operational control, Defendant owed an independent administrative duty of care to Plaintiffs and the Class to maintain an accurate, honest, and reliable automated billing architecture, separate and apart from the express contract text.

134.    Defendant breached this special relationship and its independent administrative obligations by executing self-clearing, unverified automated interest sweeps that systematically extracted unauthorized funds from consumer accounts without human oversight or programmatic validation.

135.    Defendant further breached this relationship by intentionally withholding, retaining, and failing to properly apply the resulting surplus capital to plaintiffs' principal balances,

24

utilizing its superior informational advantage to leverage an unconscionable profit from its own administrative lag.

136.   As a direct and proximate result of Defendant's breach of this special administrative relationship, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on their own behalf, and on behalf of the Class, demand judgment against Defendant as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B.   A judgment declaring that Defendant committed the violations of law alleged herein;

C.   Requiring Defendant to pay damages sustained by Plaintiffs and the Class by reason of the acts and statements alleged herein;

D.   Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorney's fees, expert fees, and other costs;

E.   Awarding rescissory damages in favor of Plaintiffs and the other Class members where appropriate against all Defendants, jointly and severally, for all injuries sustained as a result Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

F.   Issuing an Injunction to stop Defendant from continuing to charge incorrect amounts in their monthly statements for HELOC loans; and

G.   Awarding such other and further relief as this Court may deem just and proper.

25

## IX. JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all triable claims.

Dated:  July 1, 2026                                    Respectfully submitted,

By: /s/Daniel Zemel, Esq.

**ZEMEL LAW, LLC**

Daniel Zemel, Esq.
Elizabeth Apostola, Esq.
660 Broadway
Paterson, New Jersey 07514
T: (862) 227-3106
F: (973) 282-8603
DZ@zemellawllc.com

*Attorneys for Plaintiffs and the Proposed Class*

26

# EXHIBIT A

Record and Return to:    Santander Bank, N.A.
                         450 Penn Street
                         Reading, PA 19602
                         877-391-6365

## NEW YORK CREDIT LINE MORTGAGE
(Open-End)

THIS CREDIT LINE MORTGAGE is made on DECEMBER 20, 2017.

THIS CREDIT LINE MORTGAGE SECURES INDEBTEDNESS UNDER A LINE OF CREDIT AGREEMENT THAT REFLECTS THE FACT THAT THE PARTIES REASONABLY CONTEMPLATE ENTERING INTO A SERIES OF ADVANCES, PAYMENTS AND READVANCES, AND THAT LIMITS THE AGGREGATE AMOUNT OUTSTANDING AT ANY TIME TO THE MAXIMUM CREDIT LIMIT SHOWN BELOW.

**1. Parties.** The Mortgagor is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
residing at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
If there is more than one, the word "Mortgagor" refers to each and all persons identified as Mortgagor. The Mortgagee is Santander Bank, N.A., having an office located at 450 Penn Street, Reading, PA 19602. The word "Borrower" means ▮▮▮▮▮▮▮ and residing at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
If there is more than one, the word "Borrower" refers to each and all persons identified as Borrower.

**2. Maximum Credit Limit.** This debt is evidenced by Borrower's written Home Equity Line of Credit Agreement (referred to in this Mortgage as the "Agreement"), dated DECEMBER 20, 2017, providing for a maximum Credit Limit of ▮▮▮▮▮▮▮▮▮▮▮▮ and no/100 Dollars (U.S. $ ▮▮▮▮▮ ). The Agreement provides that Mortgagee will make advances and readvances during the Draw Period of the Account, which ends ten (10) years from the Date of the Agreement. The Agreement also provides that the rate of interest on amounts advanced from time to time may vary.

**3. Promises Secured.** This Mortgage secures to Mortgagee: (a) the repayment of the debt evidenced by the Agreement, with interest, finance charges, and other charges as provided in the Agreement; (b) the payment of all other sums, with interest, advanced under this Mortgage for the payment of taxes, assessments, maintenance charges, insurance premiums and costs incurred to protect the security of this Mortgage and/or the value of the Property; (c) the payment of all of Mortgagee's costs, including costs of suit and, as permitted by law, reasonable attorneys' fees and expenses, if suit is filed or other action is taken to collect the sums owing or to protect the security of this Mortgage and/or the value of the Property; (d) payment of any refinancing, substitution, consolidation, extension, modification, and/or renewal of any of the indebtedness, interest, charges, costs and expenses; (e) the performance of Mortgagor's and/or Borrower's covenants and agreements under this Mortgage and the Agreement; and (f) the repayment of the debt evidenced by any note or agreement which was refinanced by the Agreement, to the extent that such debt is owed to Mortgagee and has not been paid, and provided that no additional principal debt is owed to the Mortgagee in excess of that provided in this section and/or in excess of the maximum Credit Limit.

**4. Security Grant.** The Mortgagor does hereby mortgage, grant and convey to Mortgagee the following described property, together with all right, title, and interest in and to the land lying in the streets, roads, and streams adjacent to the premises; together with all structures, improvements or fixtures now or in the future erected on the property; any and all replacements of, additions to, or proceeds of the property; and all easements, rights and appurtenances thereon; and all rents and other profits derived from the Property; and which is described, located at and known as follows:

### PROPERTY DESCRIPTION

That certain piece or parcel of land, and the buildings and improvements thereon,:
In the Township of:
City/Town/Village of: BROOKLYN
County of: KINGS and State of: NEW YORK
and being more particularly described in a deed recorded in
Book _____    Page _____
with Town Clerk of KINGS County, City of BROOKLYN
which property is more commonly known as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ("Property Address");

The word "Property" herein shall mean all of the foregoing mortgaged property.

To have and to hold the Property unto the Mortgagee, its successors and assigns, forever. Provided, however, that if Mortgagor and/or Borrower shall pay to Mortgagee the said debt, interest, and all other sums and shall perform all covenants and agreements secured hereby, then this Mortgage and the estate conveyed by it shall terminate and become void.

100.mdf (rev. 10/13)                    -1-

CUSTOMER COPY

**5. Warranty of Title.** Mortgagor warrants and represents to Mortgagee that: (a) Mortgagor is the sole owner of the Property and has the right to mortgage and convey the Property; (b) the Property is unencumbered except for encumbrances now recorded; (c) Mortgagor will defend the title to the Property against all claims and demands except encumbrances now recorded; and (d) there are no claims outstanding against the Property except for those which are of public record entered before the date of this Mortgage.

**6. Covenants.** Mortgagor promises and agrees as follows:

(a) Mortgagor will maintain the Property in good order and repair, and will not alter, remove or change the use of any structure that is now or in the future becomes a part of the Property; (b) Mortgagor will promptly notify Mortgagee if any structure that is now or in the future becomes part of the Property is damaged or destroyed, and, if economically feasible, Mortgagor will repair or rebuild any such damaged or destroyed structure or, upon request, reimburse Mortgagee for repairing or rebuilding such structure; (c) Mortgagor will comply with all laws respecting the ownership and/or use of the Property, will not use or allow the Property to be used for any illegal purposes and will not cause or permit the presence, use, disposal, storage or release of any hazardous substances on or in the Property; (d) If the Property is part of a condominium or planned unit development, Mortgagor will comply with all by-laws, regulations and restrictions of record; (e) Mortgagor will pay and/or perform all obligations under any mortgage, lien, or security agreement which has priority over this Mortgage; (f) Mortgagor will pay all taxes and other charges assessed or levied on the Property when due and, upon Mortgagee's request, will deliver to the Mortgagee receipts showing the payment of such charges; (g) Mortgagor will use best efforts to have the owner of any prior mortgage send Mortgagee a copy of any notices that it is required to send to Mortgagor; (h) Mortgagor will promptly provide Mortgagee with a copy of any notice received from the owner of any prior mortgage; (i) Mortgagor will promptly sign any document that Mortgagee considers necessary to protect its interests in the Property; (j) Mortgagor will not sell, transfer ownership in, or enter into an installment sale contract for the sale of all or any part of the Property; (k) If Mortgagor fails to perform any duty or other obligation required by the covenants set forth in this Mortgage, Mortgagee may, at its sole option, advance such sums as it deems necessary to protect the Property and/or its rights in the Property under this Mortgage. Mortgagor agrees to repay Mortgagee any amounts advanced in accordance with this paragraph (including amounts advanced for insurance proceeds under the next paragraph), with interest at the rate provided in the Agreement (unless prohibited by law), upon demand; (l) Any interest payable to Mortgagee after a judgment is entered or on additional sums advanced under this Mortgage shall be, unless prohibited by law, at the rate provided for in the Agreement; (m) Mortgagee may make reasonable entries upon and inspections of the Property after giving Mortgagor prior notice of any such inspection.

**7. Insurance Covenants.** (a) While any part of the debts secured by this Mortgage remains unpaid, Mortgagor promises to obtain and keep in force property insurance and, if required by federal law, flood insurance on the Property. All policies must be in a form and content reasonably acceptable to Mortgagee. The property insurance must cover loss of or damage to the Property and must be in an amount sufficient to protect Mortgagee's interests; flood insurance must be of the type and in the amount required by federal law. Mortgagor agrees to provide Mortgagee evidence of required insurance. All policies must name Mortgagee as a loss payee/secured party and must provide for at least 10 days written notice to Mortgagee of reduction in coverage or cancellation. Mortgagor gives Mortgagee the right and power to sign Mortgagor's name on any check or draft from an insurance company and to apply the money to any debt secured by this Mortgage. This is limited to checks and drafts in payment of a claim under an insurance policy for loss or damage to the Property or for returned or rebated premiums on policies insuring the Property. Mortgagor does not have the right to, and agrees that Mortgagor will not, revoke the power of Mortgagee to make Mortgagor's endorsement. Mortgagee may exercise the power for Mortgagee's benefit and not for Mortgagor's benefit, except as otherwise provided by law; (b) If Mortgagor fails to keep in force the required insurance and/or fails to provide evidence of such insurance to Mortgagee, Mortgagee may notify Mortgagor that Mortgagor should purchase the required insurance at Mortgagor's expense. If Mortgagor fails to purchase the insurance within the time stated in the notice and/or fails to provide evidence of such insurance to Mortgagee, Mortgagee may purchase insurance to protect Mortgagee's interest, to the extent permitted by applicable law, and charge Mortgagor the cost of the premiums and any other amounts Mortgagee incurs in purchasing the insurance. **THE INSURANCE MORTGAGEE PURCHASES WILL BE SIGNIFICANTLY MORE EXPENSIVE AND MAY PROVIDE LESS COVERAGE THAN INSURANCE MORTGAGOR COULD PURCHASE OTHERWISE.** Except as prohibited by law, Mortgagee may receive reasonable compensation for the services which Mortgagee provides in obtaining any required insurance on Mortgagor's behalf, and if such insurance is obtained through an affiliate of Mortgagee, the affiliate may receive compensation for providing such insurance.

**8. Additional Promises.** The promises, covenants and agreements in this Mortgage shall be binding upon the Mortgagor and anyone to whom the Property or this Mortgage is transferred. The benefits and rights given in this Mortgage shall benefit the Mortgagee and anyone to whom the Mortgage is assigned. If more than one Mortgagor signs this Mortgage, each and all of them are bound individually and together. The promises, covenants and agreements in this Mortgage and Mortgagee's remedies set forth below shall not merge with any judgment entered in any legal action and shall apply until all amounts owed are paid in full.

**9. Default.** Mortgagor will be in default under this Mortgage: (a) if there is a default under the Agreement; (b) if Mortgagor breaks any promise made in this Mortgage; (c) if any Mortgagor dies; (d) if any other creditor tries to take the Property by legal process; (e) if any Mortgagor files bankruptcy or if anyone files an involuntary bankruptcy against any Mortgagor; (f) if any tax lien or levy is filed or made against any Mortgagor or the Property; (g) if any Mortgagor has made any false statement in this Mortgage; or (h) if the Property is destroyed, or is seized or condemned by the federal, state or local government.

100.mdf (rev. 10/13)                              -2-

CUSTOMER COPY

**10. Mortgagee's Remedies.** Unless prohibited by law, if Mortgagor is in default under this Mortgage, Mortgagee may, at its option, and after any notice required by law, declare the entire unpaid balance of the sums which are secured by this Mortgage and owing upon the Agreement immediately due and payable. If Mortgagee so declares such entire balance due and payable, Mortgagee may take possession of the Property, collect any and all rents, apply the rents to the indebtedness secured by this Mortgage, foreclose the Mortgage, or take other action upon the Mortgage as permitted or provided by law to collect the balance owing. If a mortgage foreclosure action or any other action on this Mortgage is filed by Mortgagee, and/or if Mortgagee takes any action to protect or enforce its interest in any court, including Bankruptcy Court, Mortgagor agrees to pay to Mortgagee all expenses and costs of such action, including, if permitted by law, reasonable attorneys' fees to the maximum extent permitted by law. In a foreclosure sale, the Property may, but need not, be sold as one parcel. In addition, Mortgagee has the right to have a receiver appointed, without notice to Mortgagor, and regardless of the adequacy of the security or solvency of Mortgagor. The receiver may further demand that anyone using the Property pay rent, and if rent is not then paid, remove such persons from the Property.

**11. Remedies Cumulative.** If any circumstance exists which would permit Mortgagee to accelerate the balance, Mortgagee may take such action at any time during which such circumstance continues to exist. Mortgagee's remedies under this Mortgage shall be cumulative and not alternative.

**12. Delay in Enforcement.** Mortgagee can delay in enforcing any of its rights under this Mortgage or the Agreement without losing that right. Any waiver by Mortgagee of any provision of this Mortgage or the Agreement will not be a waiver of the same or any other provision on any other occasion.

**13. Assignment.** Mortgagee may sell, transfer or assign this Mortgage without Mortgagor's consent.

**14. Lien Law.** This Mortgage is subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that before Mortgagor uses any funds received under the Agreement for any other purpose, Mortgagor holds such funds as a "trust fund," and must first use these funds to pay for any work done to or material used in connection with any improvement started on the Property before the date of this Mortgage but not yet paid for.

**15. Severability.** If any provision of this Mortgage is held to be invalid or unenforceable, such determination shall not affect the validity or enforceability of the remaining provisions of this Mortgage.

**16. Riders to this Mortgage.** If one or more riders are executed by Mortgagor and recorded with this Mortgage, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Mortgage as if the rider(s) were a part of this Mortgage.

☐ Condominium Rider    ☐ 1-4 Family Rider    ☐ Planned Unit Development Rider
☐ Other(s) [specify]

**17. Mortgage Tax.**    ☒ The Property is or will be principally improved by a one or two family dwelling only.
☐ The Property is or will be principally improved by a three to six family dwelling only.

WITNESS the signing of this Mortgage on the date first set forth above, intending to be legally bound.

Witness_____    Mortgagor _____ ███████

Witness _____    Mortgagor _____ ███████

Witness_____    Mortgagor _____

Witness _____    Mortgagor _____

## ACKNOWLEDGEMENT

**STATE OF NEW YORK**          )
**COUNTY OF**                  )

On DECEMBER 20, 2017, before me, the undersigned, a notary public in and for said state, personally appeared ███████████████ , personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/ her/their capacities, and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

In Witness Whereof, I hereunder set my hand and official seal.

My Commission expires: _____

Signature _____

100.mdf (rev. 10/13)                    CUSTOMER COPY

# Addendum
## to
## Home Equity Line of Credit Agreement

**Re: <u>New York Mortgage Recording Taxes</u>**

Date: 12/20/2017

Borrower #1: ███████████ _____

Borrower #2: _____

Borrower #3: _____

Borrower #4: _____

Re: Account Number ___███████___

You, the undersigned, are aware that you are obligated to pay mortgage recording taxes in the amount of $ ███████ charged by the State of New York in connection with this home equity line of credit transaction.

You understand that Santander Bank, N.A. has agreed to pay the above mortgage recording taxes on your behalf at the time this home equity line of credit account is opened for you. However, if your home equity line of credit account is closed for any reason within three (3) years of the date of this transaction:

> You agree to reimburse Santander Bank, N.A. for the full amount of the mortgage recording taxes shown above; and

> You understand and agree that the full amount of the mortgage recording taxes shown above will be included in any payoff amount provided to you as the amount required to pay the home equity line of credit account in full.

You further understand and agree that even if this home equity line of credit account is later consolidated, extended or modified, your reimbursement obligation to Santander Bank, N.A. will remain unchanged, and will continue for the full three (3) year period as provided in this Addendum, notwithstanding any provision of any consolidation, extension or modification agreement you may sign.

Further, if this home equity line of credit account is consolidated with, or is an extension or modification of, a prior line of credit account on which mortgage recording tax was previously paid, you understand and agree that the amount of the mortgage recording tax that is now due, and is shown above, does not include any prior tax amount, and that nothing in this Addendum modifies any reimbursement obligation you have undertaken to Santander Bank, N.A. in connection with such prior tax amount.

You understand and agree that all terms and conditions of the Agreement continue to apply, except as they may be modified by the terms and conditions set forth in this Addendum.

_____

Borrower #1    ████████████

_____

Borrower #2

_____

Borrower #3

_____

Borrower #4

103.mdf (rev. 10/13)                    CUSTOMER COPY

# ACKNOWLEDGEMENT OF RECEIPT OF REQUIRED HOME EQUITY LINE OF CREDIT DISCLOSURES

Date:  DECEMBER 20, 2017                    Account No. ███████ 3733

Borrower(s):           ███████████

Property Address:  █████████████████████████

Please review the below list of required disclosures, and once you have done so, please sign this document acknowledging receipt of each from Santander Bank, N.A. You should have received these disclosures either prior to today's date, in your application package, or at closing. If you have any questions about a particular disclosure, ask your Branch Representative for more information and another copy of the disclosure.

**Disclosures Required:**

Authorization To Release Information
Privacy Information Disclosure
Important Information About Procedures For Opening A New Account
General Home Equity Loan Information
Mineral, Oil and Gas Notice

**By signing this document, you acknowledge that you have been provided with the above referenced disclosures.**

_____          _____
███████████                                  Date

_____          _____
                                             Date

_____          _____
                                             Date

_____          _____
                                             Date

**Santander®**

| HOME EQUITY LINE OF CREDIT AGREEMENT ("Agreement")<br>☒ New Agreement      ☐ Amendment | Date: DECEMBER 20, 2017 |
|---|---|
| Borrower: ███████ | Account No. ████ 3733 |
| Borrower: | Credit Limit: $ ███████ |
| Borrower: | |
| Borrower: | |
| "Premises" Secured by Mortgage/Loan Security Agreement: ███████ ███████ ██ ██████ | |
| Lot/Book/Volume:          Block/Page: | City Register File #: |

We, Santander Bank, N.A. (sometimes referred to in this Agreement as "Santander Bank", "Santander" or "Bank") have approved your application for a new Home Equity Line Of Credit Account ("Account") or for an amendment to your existing Account. You, the person(s) who sign(s) as Borrower(s) below, may obtain advances charged to your Account up to your Credit Limit shown above. **Under certain circumstances, we can: (1) terminate your Account, require you to pay us the entire outstanding balance in one payment, and charge you certain fees; (2) refuse to make additional extensions of credit; and/or (3) reduce your Credit Limit.** These circumstances are described in the paragraph labeled **"Our Absolute Obligation to Make Advances"** which begins on Page 4.

**DEFINITIONS:** Unless the context requires otherwise, the following terms used in this Agreement have the following meanings: "Annual Percentage Rate" means the annualized cost of the advances charged to your Account as the result of applying a Periodic Rate to your daily Account balances each billing cycle. "Finance Charge" means the dollar amount the advances charged to your Account will cost you. "Periodic Finance Charge" is a type of Finance Charge, means the dollar amount of interest the advances charged to your Account will cost you as the result of applying a Periodic Rate to your daily Account balances each billing cycle, and is shown on the front of your Statement as the "Interest Charge". "New Balance" means the sum of the advances charged to your Account and our charges at the end of the billing cycle. "Periodic Rate" means the
daily rate of interest applicable to your Account. "Statement" means the monthly statement of our charges for your use of the Account.

**ADDITIONAL DEFINITIONS:** "New Agreement" means an Agreement provided to you in connection with a new Account.- If the "New Agreement" box above is checked, this Agreement is for a new Account. "Amendment" means an Agreement provided to you to amend your existing Account terms. If the "Amendment' box above is checked, this Agreement amends your existing Account terms.

**AMENDED AGREEMENT:** If this Agreement is an amendment to your existing Account, the terms of your existing Account are amended as provided in this Agreement. This Agreement does not extinguish your existing agreement or Account. This Agreement amends the terms of your existing Account and agreement to the extent of the provisions contained in it. Such amendments may include changes to the applicable Annual Percentage Rate, the Margin and Index used to determine the Annual Percentage Rate, the computation of the Finance Charge, other fees and charges, as well as other terms set forth in this Agreement. This Agreement may also amend your Account terms to add a Fixed Rate Lock Conversion Option, which is described below. In the event of a conflict between this Agreement and your existing agreement, the terms of this Agreement will control.

**TAX DEDUCTIBILITY:** You should consult a tax advisor regarding the deductibility of interest and charges for your Account.

**CREDIT LIMIT:** This Agreement provides for a revolving line of credit in the principal amount that is specified above as your "Credit Limit". If this Agreement amends your Credit Limit, then the Credit Limit shown above is the combined amount of the Credit Limit under your existing agreement and any increase or decrease, as applicable, in your Credit Limit resulting from this amendment. You may borrow against this line of credit, repay any portion of the amount borrowed, and re-borrow up to the amount of the Credit Limit during the Draw Period described below. Your Credit Limit is the maximum principal amount you may have outstanding at any one time. You agree not to attempt, request, or obtain an advance that will make your Account balance exceed your Credit Limit. Your Credit Limit will not be increased should you overdraw your Account. If you exceed your Credit Limit, you agree to repay immediately the amount by which your Account exceeds your Credit Limit, even if we have not yet billed you. While we are processing any payment you make (including a payment made in cash) and before we have posted that payment to your Account, your Credit Limit may not reflect that payment. In addition, we do not have to post a payment to your Account if we have reason to believe that the check or other instrument you sent to us as payment will not be honored. We may also delay reinstating your Credit Limit for the amount of any principal payment you make until we reasonably believe that the instrument you used to make your payment has been paid.

**ADVANCES AND TERM:** Unless extended by amendment, the length of the period of time during which you can obtain advances on your Account is Ten (10) years from the date of this Agreement and is referred to in this Agreement as the "Draw Period". If this Agreement is an Amendment, your current Draw Period will be extended to . You can obtain advances during the Draw Period by using one of the special checks that we will supply to you to obtain advances on your Account. Or, you can use any instrument or device that we may later provide to you to access your Account. You may <u>not</u> obtain an advance on your Account to pay the Minimum Payments due on your Account.

After the Draw Period ends, the Repayment Period will begin and you will no longer be able to obtain advances on your Account. The length of the Repayment Period is 20 years from the end of the Draw Period, as it may have been extended.

**STATEMENTS:**  We will send you a Statement at the end of any billing cycle in which an advance, payment or credit is posted to your Account, we impose any charge, or your Account reflects a balance.

**OUR SECURITY INTEREST**:  As security for all sums you owe on your Account, including future advances and our Finance Charges and other charges, all of the owners of the Premises have executed a Mortgage/Loan Security Agreement in our favor on the date first reflected above.  In this Agreement, the term "Mortgage" includes a deed of trust.  Your execution of this Mortgage/Loan Security Agreement means that you have given us a security interest in your home.  **You could lose your home if you do not meet the obligations in your Agreement with us.**  Our rights in the Premises and the obligations of the Owners are more fully described in the Mortgage/Loan Security Agreement.  If this Agreement is an Amendment, your existing Mortgage/Loan Security Agreement and the lien in our favor on your Premises created by it will continue uninterrupted.  If we request, you agree to execute a modification and extension to that Mortgage/Loan Security Agreement on the same date as this Agreement, which increases or decreases the Credit Limit, or extends the Draw Period, or both, as applicable.

**OUR CHARGES FOR YOUR ADVANCES:**

**1. Periodic Finance Charges:** A daily Periodic Finance Charge will be imposed on all advances made to your Account imposed from the date of each advance based on the "average daily balance" method. To get the average daily balance, we take the beginning balance of your Account each day, add any new advances and subtract any payments or credits and any unpaid Finance Charges. This gives us the "daily balance". Then we add up all of the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the average daily balance. We compute the Periodic Finance Charge on your Account as follows. We multiply the average daily balance by the number of days in the billing cycle, and multiply the product by the daily Periodic Rate. The average daily balance is shown on the front of your Statement as the "Balance Subject to Interest Rate."

      a.  Rate Changes.  We will determine the Periodic Rate and the corresponding Annual Percentage Rate monthly as follows: We start with an independent index which is the highest rate reflected as the latest U.S. Prime Rate published in the Money Rates table of The Wall Street Journal (the "Index").  To determine your initial Annual Percentage Rate, we use the most recent Index value available to us on the date you sign this Agreement.  Thereafter, we use the Index value available on the first business day of each calendar month to determine your Annual Percentage Rate. The Index is not necessarily the lowest rate charged by us on our loans.  If the Index becomes unavailable during the term of this Agreement, we may designate a substitute index after notice to you.  To determine the daily Periodic Rate that will apply to your Account, we add  0.500 % percentage points (the "Margin", which includes any applicable Preferred Rate Reduction described below) to the value of the Index, and then divide that
 sum by the number of days in a year.  To obtain the Annual Percentage Rate that corresponds to the Periodic Rate, we multiply the daily Periodic Rate by the number of days in a year.  The resulting product is the Annual Percentage Rate that corresponds to the Periodic Rate.  This Annual Percentage Rate includes only interest and no other costs.

The Periodic Rate and the corresponding Annual Percentage Rate may increase or decrease as often as once each month. The Periodic Rate and the corresponding Annual Percentage Rate will also increase upon the termination of any applicable Preferred Rate Reduction described below. The maximum **ANNUAL PERCENTAGE RATE** that can apply during the term of this Agreement is the lesser of 18% or the maximum rate allowed by applicable law. The **ANNUAL PERCENTAGE RATE** will never be less than 2.24%.  Except for this 2.24% minimum and this 18% maximum (or, if less, the maximum rate allowed by applicable law), there is no limit on the amount by which the Annual Percentage Rate or the corresponding Periodic Rate can change during any one-year period. The maximum interest payment for a 30 day period at the highest **ANNUAL PERCENTAGE RATE** permitted hereunder (18%) based on your Credit Limit shown above would be $ 11,095.88.

Adjustments to the Periodic Rate and the corresponding Annual Percentage Rate resulting from changes in the Index will take effect monthly, beginning with the first day of the first billing cycle in the calendar month.

**Preferred Rate Reduction:** If you have asked us to automatically deduct your Minimum Payment from your Santander checking account, your Margin, Periodic Rate and Annual Percentage Rate described in the paragraph entitled **OUR CHARGES FOR YOUR ADVANCES** reflect a reduction in the Margin. The amount of this reduction is the Preferred Rate Reduction. If you authorize us to automatically deduct your Minimum Payments from your Santander Select checking account, your Preferred Rate Reduction is 0.50 percentage points. If you authorize us to automatically deduct your Minimum Payments from any other type of Santander checking account, your Preferred Rate Reduction is 0.25 percentage points. Any such Preferred Rate Reduction will remain in effect only so long as that automatic deduction authorization remains in place. You may stop this automatic deduction service by telling us or by closing the Santander deposit account from which automatic payments are made. We may stop this automatic deduction service if  we close the Santander deposit account from which automatic payments are made or if you do not maintain enough funds in that account to pay your Minimum Payment.

      b.  The Initial Rate.  For new lines of credit, your initial APR is based on the highest U.S. Prime Rate published in the Money Rates table of The Wall Street Journal on the date you sign the credit agreement for your new credit account. Thereafter, your APR is based on the highest U.S. Prime Rate published in the Money Rates table of  The Wall Street Journal on the first business day of the calendar month.  Based on the Index and Margin and any applicable Preferred Rate Reduction in effect on the day you signed this Agreement, and subject to any minimum or maximum **ANNUAL PERCENTAGE RATE** set forth in this Agreement, the initial **ANNUAL PERCENTAGE RATE** is  5.000%, which corresponds to an initial daily Periodic Rate of   0.01370%.

**2. Late Charges:**  If your Minimum Payment is not received within 15 days of the Payment Due Date shown on your Statement, we will charge and you agree to pay a Late Charge of 10% of the unpaid portion of the Minimum Payment or $20, whichever is greater.

**3. Application Fee:** We will charge and you agree to pay a non-refundable fee of $400 when the Account is opened and used for Swing Line purposes. *(A Swing Line is interim financing secured by your existing property and used for the purchase of a new residence prior to the sale of the existing property.  A Santander Bank Swing Line is available only when the financing for the purchase of the new residence is obtained through Santander Bank.)*

CUSTOMER COPY

**4. Termination Fee:** If we close your Account at your request within 36 months of the Agreement date shown above and you were not required to pay any closing costs when the Account was opened, we will charge and you agree to pay a Termination Fee of $450. However, we will not charge this fee if your Account is refinanced with us or if the Account was used for Swing Line purposes.

**5. Fixed Rate Lock Fee:** We will charge and you agree to pay a fee of $50 assessed to your Account for each Fixed Rate Lock you request and we approve. This fee is a **FINANCE CHARGE**. Please see the paragraph below entitled "Fixed Rate Lock Conversion Option."

**6. Annual Fee:** Any annual fee will be charged in the 13th month after you open the Account and in about the same billing cycle of each following year during the Draw Period. The amount of the fee will be $0, $25 or $50, depending on the type of Santander deposit account you have at the time the fee is assessed,
 and may change if the type of deposit account is changed by you. Your annual fee will be waived (i.e., will equal $0) as long as you maintain a Santander Select, Premier, Business Owner Premier, Premier Partnership, Team Member Private or Team Member Checking Account or Premier Money Market Savings Account. An annual fee of $25 will be charged as long as you maintain a Santander Preferred, Business Owner Preferred or Preferred Partnership Checking Account or Preferred Money Market Savings Account. An annual fee of $50 will be charged if you do not maintain one of the deposit accounts named above including when you open a Santander Preferred Plus account.

**7. Other Charges:** We will charge and you agree to pay the following additional charges on your Account, all of which are non-refundable unless otherwise stated:
a.      We will charge you a Returned Item Charge of $35.00 whenever your payment is returned for insufficient funds or for any other reason.
b.      We will charge you $20 for each hour (or portion of an hour) of research that we perform at your request, unless such research is performed in connection with a proper written notice of a billing error.
c.      We will charge you an overlimit fee of $35.00 whenever any special check or other advance request causes (or would have caused) you to exceed your Credit Limit, whether or not we honor your advance request.
d.      If we obtain an appraisal or evaluation of the Premises, you request a copy of same after ninety (90) days following the date of your credit decision and your Account is secured by a subordinate lien on the Premises, we will charge you $5 a page to supply the cop y, with a maximum fee of $50. To request a copy, please write to us at Santander Bank, N.A., Home Equity Processing, P.O. BOX 1397, Providence, RI 02901.
e.      If you request a copy of any document, including a special check or a Statement, we will charge you $5 per page for each copy we supply in response to your request. If your request is related to a billing error (see the portion of this Agreement entitled "Your Billing Rights   Keep This Notice for Future Use") and an error is found, we will reverse or refund any copy charges assessed.
f.      We will charge you a fee of $25 whenever you request that we stop payment of a special check or other request for an advance on your Account. After you place a stop payment request on your special check or other advance request, you understand and agree that we have a reasonable period of time (24 hours or more) to act on your stop payment request. This means that even after you place a stop payment request, we may nonetheless pay your special check or other advance request if we have not had an opportunity to effectuate your stop payment request.
g.      We will charge you for our actual costs of credit reports and appraisals incurred in investigating whether any condition permitting us to temporarily suspend credit availability or reduce the Credit Limit on your Account exists or continues to exist.
h.      We will charge you (and add to the total amount shown on any payoff statement we supply on your Account) the then-current fee to discharge the Mortgage or terminate any UCC Financing Statement securing the Account or any extension or modification thereof. Except as otherwise required by law, this fee will be waived if you agree to record the Mortgage discharge or terminate any UCC Financing Statement yourself.
i.      If we supply a payoff statement on your Account by facsimile transmission, we will charge you our then-current facsimile transmission fee (presently $20) and will add the fee to the total amount shown on your payoff statement.
j.      We will charge you a tr ust review fee of $175 whenever it appears that the Premises are held in trust. You must pay this fee prior to any opening of the Account.

**MINIMUM PAYMENT:** You promise to pay all advances, periodic and other Finance Charges and any other fees and charges set forth in this Agreement. To the extent your payments reduce the outstanding principal balance on the Account to an amount less than the Credit Limit, such payments restore your credit availability during the Draw Period. For each monthly billing period in which a balance is outstanding on your Account, you must pay us a Minimum Payment, which we must receive by the Payment Due Date shown on your Statement. The amount of any Minimum Payment or other payment that is applied to interest (periodic Finance Charge) or principal on your Account may vary, depending upon when payments are received. You may at any time pay more than the Minimum Payment without incurring a penalty, but if you request that we close your Account under the circumstances set forth in subparagraph 4 of the paragraph of this Agreement entitled "Our Charges For Your Advances", we will impose a Termination Fee as set forth in that subparagraph. If you make a payment that exceeds your Minimum Payment, or make an additional payment when no payment is then due, we may apply the excess or additional payment amount to any balance in the Revolving Account portion of your Account before we apply it to any Fixed Rate Lock(s) that you may have established on your Account.

**RECEIPT OF PAYMENTS:** All payments must be made by automatic electronic payment transfer, check, money order or other instrument in U.S. dollars and must be received by us at the remittance address shown on your Statement. Payments received at that address by 5:00 PM Eastern Standard Time on any business day will be credited to your Account as of the date received. If we receive payments at other locations, such payments will be credited promptly to your Account, but crediting may be delayed for up to five (5) days after receipt. If you have elected to make your payments by automatic electronic payment transfer, payments will be processed on the date the payment is due. However, if the scheduled due date falls on a Sunday or bank holiday, the transfer will be processed on the next business day. If the funds necessary to cover any payment are uncollected or insufficient on the transfer date, a Returned Item Charge may be assessed. If any automatic electronic payment transfer is returned to us unpaid, you will be responsible for making that payment by other means. If you do not maintain sufficient funds in the account from which you have authorized automatic electronic payments, your automatic electronic payment transfer service may be cancelled and any Preferred Rate Reduction applicable to your Account may be terminated. Payments received at any of our branch offices on a business day (Monday - Friday) before the cut off time posted at that office will be credited to your Account as of the date of receipt. Payments received on a non-business day (Saturday, Sunday or a bank holiday) or after the posted cut off time will be credited to your Account as of the following business day. Payments received by any other method on a non-business day will also be credited as of the following business day.

- 3 -

066 (rev 11/16)

CUSTOMER COPY

**ELECTRONIC PAYMENT:** Each time you make a payment by check, we may convert your check into an electronic payment. By sending us a check, you authorize us to convert your check. When we do this, the funds may be withdrawn from your account more quickly than if we had processed your original check so always make sure you have enough funds in your account to make your payment. After we convert it, your check will not be sent back to you because we are required to destroy it. We do, however, keep an electronic copy. If you do not wish us to convert your check or if you need more information, please call us at 877-768 2265.

**PAYMENT OPTIONS:**

Payment Option 1:  ☒ If the box preceding this sentence is checked, for any billing cycle during the Draw Period, your Minimum Payment will be equal to the sum of (i) all accrued Finance Charge for the billing cycle (minimum $20), plus (ii) any other fees and charges and any amounts past due, in excess of your Credit Limit or otherwise in default. For any billing cycle after the end of the Draw Period, your Minimum Payment will be equal to the sum of (i) 1/240th of the outstanding balance of principal at the end of the Draw Period, or $20, whichever is more, plus (ii) all accrued Finance Charge for the billing cycle, plus (iii) any other fees and charges and any amounts past due, in excess of your Credit Limit or otherwise in default. You must also pay any Late Charges then outstanding. The amount of your Minimum Payments may increase if the Annual Percentage Rate increases. NOTE: Although interest-only payments will be less than principal and interest payments each month, interest-only payments do not reduce the principal balance owed on the Account, may prolong the repayment obligation, and result in greater total expenses over the life of the Account than if principal and interest payments (Payment Option 2 below) had been selected during the Draw Period.

Payment Option 2:  ☐ If the box preceding this sentence is checked, for any billing cycle during the Draw Period, your Minimum Payment will be equal to the sum of (i) 1/240th of the average daily balance plus all accrued Finance Charge at the end of the billing cycle, or $20, whichever is more (or the entire balance if less than $20), plus (ii) any other fees and charges and any amounts past due, in excess of your Credit Limit or otherwise in default. For any billing cycle after the end of the Draw Period, your Minimum Payment will be equal to the sum of (i) 1/240th of the outstanding balance of principal at the end of the Draw Period, or $20, whichever is more, plus (ii) all accrued Finance Charges for the billing cycle, plus (iii) any other fees and charges and any amounts past due, in excess of your Credit Limit or otherwise in default. You must also pay any Late Charges then outstanding. The amount of your Minimum Payments may increase if the Annual Percentage Rate increases.

**Change to Payment Option:** After you choose a Payment Option, you may ask us to change your Payment Option during the Draw Period, as long as we consider your Account to have been in good standing at all times. Any changes in your Payment Option must be for a period of not less than 12 months.

**RIGHT OF SET OFF:** You authorize us to apply money from your deposit account(s) with us, now or in the future, to pay all or any part of any amount past due under this Agreement, without notice.

**AUTOMATIC PAYMENT AUTHORIZATION:** If an account number is inserted in the following space, you authorize us to deduct the amount of your Minimum Payment on the Payment Due Date shown on your Statement from your checking, money market or statement savings account; (Account Number: ▮▮▮▮▮▮▮            ) with us or with
N/A                                      and to make the payment then due on your Account.

**PROPERTY INSURANCE:** You must obtain and maintain adequate insurance against fire, flood and such other risks to the Premises as we require. This requirement protects our interests in the Premises while this Agreement is in effect. YOU MAY OBTAIN SUCH INSURANCE FROM ANY AGENT, PRODUCER, BROKER OR INSURANCE COMPANY OF YOUR CHOICE licensed to do business in the state where the Premises is located. Your choice of agent, producer, broker or insurance company will not affect our credit decision. However, we reserve the right to refuse to accept any insurance company or policy for reasonable cause. The policy must name us as "mortgagee" and provide us with not less than 30 days' notice of any cancellation or reduction in coverage. You must provide us with evidence of such insurance coverage promptly upon our request. You agree to timely pay all insurance premiums (including any increase in premiums) as they come due. In the event of an insured loss, you agree to promptly advise us of the loss and to file a proof of loss with the insurance company. You appoint us your attorney-in-fact, in your name or in ours, to file a proof of loss if you fail or refuse to do so, and to endorse your name to any check, draft or other instrument in payment of an insured loss. We may allow you and the Owners to apply any insurance proceeds to the repair of the Premises if we believe the repairs will be done properly and if we have never declared your Account to be in default, reduced your Credit Limit or suspended or closed your Account.

**OUR ABSOLUTE OBLIGATION TO MAKE ADVANCES:** Except as provided below, our agreement to make advances to you during the Draw Period is an absolute obligation on our part. This means we must make each and every advance you properly request during the Draw Period, up to your Credit Limit, under this Agreement. However, our absolute obligation to make advances to you during the Draw Period ends when any of the following happens:

**1. We declare your Account to be in default,** which we can do when:
a. You fail to meet the repayment terms of this Agreement for any outstanding balance.
b. There is fraud or a material misrepresentation by you in connection with your Account.

c. Any action or inaction by you adversely affects our security for your Account, or any right we have in such security. Among other things, such action or inaction would include:

- the sale or transfer of title to the Premises without our consent,
- your abandonment of the Premises, which adversely affects our security in the Premises,
- your failure to maintain the required property insurance coverages on the Premises,
- your failure to maintain the Premises in good condition and repair, which adversely affects our security in the Premises,
- your permitting anything to be done to the Premises that would constitute waste or destruction of the Premises, or that would render the Premises unsafe or unfit for human habitation (such as by bringing or storing hazardous or toxic substances on the Premises), which adversely affects our security in the Premises,

066 (rev 11/16)                          - 4 -
CUSTOMER COPY

- your doing of any unlawful act that subjects the Premises to seizure by governmental authorities,
- your failure to pay taxes on the Premises,
- your permitting any liens to be filed on the Premises which are superior to ours,
- foreclosure by any prior mortgagee or lienholder which adversely affects our interest in the Premises,
- a taking of all or part of the Premises in a proceeding in eminent domain or condemnation,
- the death of the sole Borrower obligated on your Account, or if there are more than one of you, the death of any of you or any Owner of the Premises that results in a transfer of title to the Premises to a person who is not a party to our security interest in the Premises or that otherwise adversely affects our security in the Premises, or,
- if the Premises is a cooperative apartment, your breach of any of the promises you have made under the proprietary lease of the Premises, the cancellation or termination of your proprietary lease, any failure of the cooperative corporation to pay when due any mortgage payments, leasehold payments and/or real estate taxes it is obligated to pay or its failure to insure the building in which the Premises is located, or the institution of foreclosure, bankruptcy or insolvency proceedings by or against the cooperative corporation, to the extent that any of the foregoing adversely affects our security or any right we have in the security.

If one or more of the above events occurs, we can temporarily or permanently reduce your Credit Limit or temporarily or permanently suspend your ability to obtain advances, or we can declare your Account to be in default. However, we can declare your Account in default only by personally delivering or mailing to you a written notice of default. Our notice of default will become effective when we personally deliver it to you or place it in the mails, even though you might not receive our mailed notice. If we declare your Account in default, we will immediately terminate credit availability on your Account. If we choose, we may also send you a notice of our intention to take action, advising you that if you do not cure the default within the time period then provided by law, we will demand repayment of the entire outstanding balance in one immediate payment and exercise our security interest and right of set-off against any of your property, including deposit accounts, then in our possession (unless prohibited by applicable law).

Except as otherwise provided below, if we do not receive payment in full, we may also foreclose upon the Premises and take any other action allowed by law. You agree to pay the court costs and collection fees we incur in the collection and enforcement of your Account, as well as our reasonable attorney's fees, to the extent permitted by law, if we refer your Account to an attorney or collection agency for collection. You agree to pay periodic Finance Charges at the variable Annual Percentage Rate provided in this Agreement on the outstanding balance of your Account until we receive payment in full, even if we have demanded payment in full or obtained a judgment against you. If you cure the default in the manner provided by law, you will restore your right to make Minimum Payments each month as if you had never been in default, but you will not restore your right to obtain additional advances on your Account.

If one or more of the above events occurs, we may elect to waive our right to declare your Account in default. If we waive that right, we will remain absolutely obligated to make all advances you properly request on the Account during the Draw Period. However, that waiver does not bind us if a similar or different event occurs later. At that time, we have the right to decide whether to declare your Account in default.

**For New Hampshire Borrowers**:  If we do not receive payment in full, we may also foreclose upon the Premises and take any other action allowed by law. You agree to pay us all reasonable costs we incur to collect this debt or realize on any security, to the extent permitted by law. This includes court costs, attorney's fees for services rendered by an attorney for collection when the attorney is not our salaried employee, and/or collection agency fees. However, if you prevail in any action, suit or proceeding we bring or in an action you bring, reasonable attorney's fees shall be awarded to you. If you successfully assert a partial defense, setoff, recoupment or counterclaim to an action brought by us, the court may withhold from us the entire amount or such portion of the attorney's fees as the court deems appropriate. You agree to pay periodic Finance Charges at the variable Annual Percentage Rate provided in this Agreement on the outstanding balance of your Account until we receive payment in full, even if we have demanded payment in full or obtained a judgment against you. If you cure the default in the manner provided by law, you will restore your right to make Minimum Payments each month as if you had never been in default, but you will not restore your right to obtain additional advances on your Account.

**2. Any of you request final termination of your Account.**  Final termination become effective as soon as we terminate your ability to obtain advances and all sums owed to us and our charges are paid in full. At that time, we will terminate the security interest or provide appropriate documents to you to enable you to terminate the security interest in the Premises.

**3. You or we temporarily reduce your Credit Limit or temporarily suspend your ability to obtain advances,** which can be done only if one or more of the following events occur:
a. Any of you notify us, in person or in writing, of an intention to terminate your Account, or that you do not want to be obligated for any advances obtained or to be obtained by you or any Borrower on the Account (except in connection with a good faith billing dispute), or any Owner advises us of a desire or intention that the Premises not serve as security for existing or future advances. We will treat a request for termination by an Owner who is not also a Borrower as a request for temporary suspension. Any suspension will become effective once we can reasonably act to stop new advances from being made on your Account. However, we may honor any and all requests for advances which were made or are dated prior to that time.

b. Any of the following things happen and we choose to freeze your Account by temporarily reducing your Credit Limit or suspending your ability to obtain advances:
(1) The value of the Premises declines significantly below its original appraised value.
(2) We reasonably believe that you will be unable to fulfill the repayment obligations under this Agreement because of a material change in your financial circumstances.

- 5 -

CUSTOMER COPY

(3) We are precluded by government action from imposing the Annual Percentage Rate provided in this Agreement.
(4) The priority of our security interest in the Premises is adversely affected by government action to the extent that the value of our security interest is less than 120 percent of the Credit Limit.
(5) You are in default of any of the following "material obligations" under this Agreement:
    (a) Any of you fails to honor your obligations on any prior security interest in the Premises.
    (b) Any of you does not pay any other obligation you owe to us or to others as and when that obligation comes due, or a proceeding is begun by or against any of you under the Federal Bankruptcy Code.
    (c) Any of you are incarcerated or declared legally incompetent.
    (d) Any of you fails to promptly provide us with satisfactory financial information which we may request from time to time or to cooperate with us in appraising the Premises which we may elect to do from time to time.
    (e) If there are more than one of you, any person on whose income we materially relied in agreeing to open the Account dies.
    (f) You move out of the Premises or convert the Premises from your residence or vacation home to an investment or rental property.
    (g) You permit an intervening lien to be filed against the Premises that would take priority over future advances made by us.
(6) We are notified by our regulatory agency that continued advances on your Account constitute an unsafe and unsound practice.
(7) The maximum Annual Percentage Rate is reached.
(8) An event occurs which gives us the right to declare your Account to be in default.
We will send you a notice not later than three business days after we take such action, advising you of the specific reasons for our action. Our notice will advise you that you may request reinstatement of your credit privileges when the condition which led to our action no longer exists (and provided that no other condition listed above exists that would allow us to temporarily reduce your Credit Limit or suspend your ability to obtain advances).

## 4. The Draw Period Ends.

**YOUR OBLIGATIONS CONTINUE ON ACCOUNT CLOSURE OR SUSPENSION:** Upon closure or suspension of your Account, whether by you or by us, you remain obligated to pay all amounts owed to us under this Agreement, including our Finance Charges and other fees and charges. This means you must continue to make at least the Minimum Payments each month under the terms of this Agreement.

**REINSTATEMENT:** You may request reinstatement of the credit privileges on your Account for the remainder of the Draw Period at any time after the condition that permitted us to temporarily reduce your Credit Limit or temporarily suspend your ability to obtain advances ceases to exist (provided that no other condition exists that would allow us temporarily reduce your Credit Limit or suspend your ability to obtain advances). If you request reinstatement, you may be required to pay any appraisal and credit report fees we incur in investigating whether any condition permitting reduction or suspension continues to exist. We will reinstate credit privileges on your Account when we find that those conditions have ceased to exist. If you or any Owner of the Premises requested reduction or suspension of the Account, we will reinstate your Account or its former Credit Limit, as applicable, for the remainder of the Draw Period only if all of you and all Owners advise us in writing of a desire to reinstate the Account or former Credit Limit. However, we may refuse to reinstate your Account or its former Credit Limit until we are assured that our rights in any security for your Account have not been adversely affected by the reduction or suspension.

**TAXES; REPAIRS:** You agree to pay all taxes on the Premises (including any tax increases) and to maintain the Premises in good condition and repair.

**FOSSIL FUELS AND MINERALS.** You agree not to store, transport, extract or engage in any surface or other activity in furtherance of the extraction of oil, gas, coal, other fossil fuels or minerals from, on or below the Property. You also agree not to permit anyone else to take any such action. You agree not to lease, assign, transfer, develop or permit the development of any oil, gas, coal, other fossil fuels or minerals associated with the Property or any rights in such fuels or minerals. You understand and agree that any breach of any of the covenants and agreements of this paragraph may be treated by us as an action or failure to act that adversely affects our security for your Account or any right we have in such security. (Requirement does not apply to condos.)

**OTHER ADVANCES:** If you fail to purchase property insurance, or do not pay taxes when they come due, or do not properly maintain the Premises, we may, if we choose (but without any obligation on our part), advance sums for these purposes in order to protect our interest in the Premises. Any advances we make will not excuse you from your failure to honor your promises and obligations in this Agreement. Any such amounts we advance will be charged to your Account in the same manner as any other advance hereunder.

**OWNERSHIP OF SPECIAL CHECKS:** You agree that any special checks and other credit instruments or devices which we may supply to you to use in connection with your Account are our property. All unused checks , instruments or devices must be returned to us immediately upon demand. We may retain all checks and other instruments you draw in connection with your Account and will not return such to you with any Statement.

**PROOF OF ADVANCES:** Your Statements will indicate the current status of your Account and identify the transactions posted during the billing cycle. If you need evidence of an advance or other transaction, we will provide you with photographic or other reasonable evidence of any special check or other document that you timely request. You agree that such evidence will be satisfactory to you for all purposes.

**REFUSAL TO ACCEPT SPECIAL CHECKS:** You agree that we are not responsible if, for any reason, anyone fails or refuses to accept any special check or other credit instrument or device that you may tender or use.

- 6 -

066 (rev 11/16)

CUSTOMER COPY

**AMENDMENTS TO THIS AGREEMENT:** We may amend this Agreement by entering into a separate written agreement with you or by making a change that is either beneficial to you or insignificant. However, if we temporarily reduce the Annual Percentage Rate or fees and charges on your Account below those contained in this Agreement, we can impose the agreed Annual Percentage Rate or fees and charges by notifying you of our intention to impose the same.

**The paragraphs in this Agreement that are entitled "Advances and Term", "Our Charges for Your Advances ", "Payment Options" and "Our Absolute Obligation to Make Advances" assume that you have not elected the Fixed Rate Lock Conversion Option described below. However, if you elect the Fixed Rate Lock Conversion Option, the following terms modify the above-listed paragraphs, as described below:**

FIXED RATE LOCK CONVERSION OPTION:

After you open your Home Equity Line of Credit ( Account  or  plan ), you may ask us to change your variable interest rate to a fixed rate of interest ( Fixed Rate Lock ) on all or a portion of your principal balance, as long as we consider your Account to have been in good standing at all times.  This option will be available only during the Draw Period.  If there is more than one Borrower on your Account, we may establish a Fixed Rate Lock upon the request on any one or more of you.

The minimum amount of your principal balance for which you may elect a
 Fixed Rate Lock is $5,000. The repayment term for any Fixed Rate Lock must be at least 12 months and may not exceed 180 months or the maturity date of your Account, whichever is earlier.  You may have up to four Fixed Rate Locks outstanding on your Account at any one time.  However, you may not transfer a Fixed Rate Lock balance to a new Fixed Rate Lock balance for a period of 12 months following the establishment of the Fixed Rate Lock, and you may not transfer additional amounts to any Fixed Rate Lock once it has been established.  The portion of your credit line that is not transferred to a Fixed Rate Lock is called your Revolving Account.  The amount of each Fixed Rate Lock balance will reduce your available credit on your Revolving Account.   As you repay the principal balance of each Fixed Rate Lock, your available credit on your Revolving Account will increase as a result.

The fixed rate of interest applicable to a Fixed Rate Lock will be determined at the time of each Fixed Rate Lock request and wi ll be based on current market conditions at that time, except that the rate applicable to a Fixed Rate Lock will never be greater than 18% **Annual Percentage Rate** or less than 2.24% **Annual Percentage Rate**.  The rate may depend on a number of factors, including the requested term,  property type, the automatic payment deduction option, if any, you have selected and the combined loan-to-value ratio on the property that secures the plan.  Once the rate associated with each Fixed Rate Lock balance has been established, that rate will not change.  A recent **Annual Percentage Rate** that we have charged on a $10,000 Fixed Rate Lock balance was 5.24%.  This Annual Percentage Rate included only interest and no other costs.  As an example, the monthly payment for a Fixed Rate Lock balance of $10,000 at 5.24% **Annual Percentage Rate** for a period of 120 months would be $107.25.  The amount of each Fixed Rate Lock payment will be included in the Minimum Payment due on your monthly statem ent.

Regardless of the Draw Period Payment Option you select on your Revolving Account, repayment of each Fixed Rate Lock balance will be based on substantially equal monthly payments for a term you choose (but not to exceed 180 months or the maturity date on the Account, whichever is earlier) in an amount sufficient to repay the principal balance of each Fixed Rate Lock, together with interest at the Annual Percentage Rate established for each Fixed Rate Lock.  A daily periodic Finance Charge will be imposed on your Fixed Rate Lock balance from the date each Fixed Rate Lock is established, based on the  average daily balance  method.  The amount of your final payment for each Fixed Rate Lock may vary, depending on whether your monthly payments are received early, on time or following their due dates.  After each Fixed Rate Lock is established, the Minimum Payment due on your Account will include the minimum monthly payment for your Revolving Account, plus the minimum monthly payments for all Fixed Rate Loc k balances outstanding.  The Minimum Payment due for your Account will be reflected on your monthly billing statement.  Payments received will be applied to the minimum monthly payment for each Fixed Rate Lock in the order each Fixed Rate Lock was established.  We will charge a fee of $50 to your Revolving Account for each Fixed Rate Lock request we approve and process.  This fee is a **Finance Charge**.

**BINDING EFFECT:** If more than one of you signs as Borrower, each of you will be liable, separately and together, for all advances obtained on the Account, no matter which of you obtains them. All of you agree that any one or more of you may obtain advances on the Account. This Agreement obligates you and your estate, heirs and personal representatives and benefits us and our successors and assigns. We may add or release other parties, permit the addition, release or substitution of collateral and/or modify or extend this Agreement without releasing, modifying or otherwise affecting your obligations hereunder.

**CONTINUED EFFECTIVENESS:**  If we honor special checks or other requests for advances after your death or declaration of legal incompetency, but before we receive actual written notice of either event, those advances will be valid, legal and binding obligations on you and your estate, heirs and personal representatives.

**IRREGULAR PAYMENTS; DELAY IN ENFORCEMENT:** We may accept partial or late payments of sums due on your Account without losing any of our rights under this Agreement. We may accept checks, instruments or documents marked "paid in full" or with similar language indicating that our acceptance of the check, instrument or document would be in full satisfaction of your outstanding balance, without being bound by that language or losing any of our rights under this Agreement. Any such check, instrument or document must be mailed to: Santander Bank, N.A., Mail Stop 10-421-CP2, Consumer Lending, P.O. Box 12646, Reading, PA 19612. We can delay enforcing our rights under this Agreement without losing them.

**CREDIT REPORTS AND APPRAISALS:** From time to time, we may review your Account to determine whether, in our reasonable opinion, a material change has occurred in your financial circumstances that would leave you unable to fulfill the repayment obligations under this Agreement. As part of such reviews, we may obtain additional credit reports on you, inspect or reappraise the Premises, and request additional financial information from you.  You agree to cooperate with us in performing such reviews and to promptly provide satisfactory financial information to us.

066 (rev 11/16)                                                  -7 -

**ACCOUNT SERVICING:** You expressly consent to our using prerecorded /artificial voice messages and/or an automatic telephone dialing system while servicing or collecting your Account, as the law allows. In doing so, you agree that we and any assignee of this Agreement may use any telephone number you provide us, including any number provided on the credit application even if that number is for a cellular telephone and/or our using the number results in charges to you.

**TRANSFER AND ASSIGNMENT:** Your rights under this Agreement belong only to you. You cannot transfer or assign them to anyone else. We may transfer and assign our rights and obligations under this Agreement and the Mortgage/Loan Security Agreement at any time without your consent. Any person to whom we transfer and assign this Agreement and the Mortgage/Loan Security Agreement shall be entitled to all of our rights and shall be subject to all of our obligations under this Agreement and the Mortgage/Loan Security Agreement. Your obligations shall be unaffected by any transfer or assignment, except to the extent that may be obligated to send payments to, or otherwise interact with, a new servicer for Account.

**APPLICABLE LAW; ENTIRE AGREEMENT:** You understand and agree that this Agreement is  governed by Delaware law (without regard to principles of conflicts of law or choice of law) and by federal law. If this is a New Agreement, it is the entire agreement between you and us. No modification, deletion or addition to this Agreement may be made at any time unless the modification, deletion or addition is in writing and is signed by the party to be bound thereby. Any modification, deletion or addition purportedly made to this Agreement in any other manner, whether before or after signature of this Agreement, shall have no effect. If any provision of this Agreement is held to be void or unenforceable, the rest of this Agreement shall remain in full force and effect.

**YOU ACKNOWLEGE RECEIVING A COMPLETED COPY OF THIS AGREEMENT.** PLEASE RETAIN A COPY FOR YOUR RECORDS.

| | |
|---|---|
| _____(SEAL) <br> Borrower | _____(SEAL) <br> Borrower |
| _____(SEAL) <br> Borrower | _____(SEAL) <br> Borrower |
| _____(SEAL) <br> Borrower | _____(SEAL) <br> Borrower |
| _____(SEAL) <br> Borrower | _____(SEAL) <br> Borrower |

CUSTOMER COPY

**YOUR BILLING RIGHTS - KEEP THIS NOTICE FOR FUTURE USE.**

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify Us In Case of Errors or Questions About Your Bill**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the following address;
Santander Bank
Mail Stop: 10-421-CX2
450 Penn Street
Reading, PA 19602

Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:
- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error.
  If you need more information, describe the item you are not sure about.

**Your Rights and Our Responsibilities After We Receive Your Written Notice**

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

* * * * * * * * * * * * * * *

- 9 -

066 (rev 11/16)

CUSTOMER COPY

## INDEX

| TOPIC | PAGE |
|---|---|
| Account Servicing | 8 |
| Additional Definitions | 1 |
| Advances & Term | 1 |
| Amendment | 1 |
| Amendments | 6 |
| Applicable Law | 8 |
| Annual Fee | 3 |
| Application Fee | 2 |
| Automatic Payment Authorization | 4 |
| Binding Effect | 7 |
| Continued Effectiveness | 7 |
| Credit Limit | 1 |
| Credit Reports And Appraisals | 7 |
| Definitions | 1 |
| Delay In Enforcement | 7 |
| Electronic Payment | 4 |
| End Of Obligation To Make Advances | 4, 5 |
| Entire Agreement | 8 |
| Finance Charges | 2 |
| Fixed Rate Lock Conversion Option | 7 |
| Fixed Rate Lock Fee | 3 |
| Initial rate | 2 |
| Irregular Payments | 7 |
| Late Charges | 2 |
| Minimum Payment | 3 |
| Other Advances | 6 |
| Other Charges | 2 |
| Our Absolute Obligation To Make Advances | 4, 5 |
| Our Charges for Your Advances | 2, 3 |
| Our Security Interest | 2 |
| Ownership Of Special Checks | 6 |
| Payment Options | 4 |
| Preferred Rate Reduction | 2 |
| Proof Of Advances | 6 |
| Property Insurance | 4 |
| Rate Changes | 2 |
| Receipt of Payments | 3 |
| Refusal To Honor Requests For Advances | 6 |
| Reinstatement | 6 |
| Right Of Set Off | 4 |
| Statements | 2 |
| Tax Deductibility | 1 |
| Taxes; Repairs | 6 |
| Termination Fee | 3 |
| Transfer And Assignment | 8 |
| Your Billing Rights | 9 |
| Your Obligations Continue On Temporary Suspension | 6 |

066 (rev 11/16)

CUSTOMER COPY

 Santander

## NOTICE OF RIGHT TO CANCEL
### (When Opening Home Equity Line Account)

**Your Right to Cancel** account #    ████3733

    We have agreed to establish a Home Equity Line Account for you, and you have agreed to give us a mortgage or deed of trust on your home as security for the Account. You have a legal right under federal law to cancel the account, without cost, within three business days after the latest of the following events:

(1)   the opening date of your Account which is  12/20/2017  ; or

(2)   the date you received your Truth in Lending disclosures; or

(3)   the date you received this notice of your right to cancel the account.

**What Happens If You Cancel**

    If you cancel the account, the mortgage or deed of trust on your home is also cancelled. Within 20 days of receiving your notice, we must take the necessary steps to reflect the fact that the mortgage or deed of trust on your home has been cancelled. We must return to you any money or property you have given to us or to anyone else in connection with the account.

    You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address shown below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**How to Cancel**

If you decide to cancel the account, you may do so by notifying us in writing, at the following address:

> Santander Bank, N.A.
> Home Equity Processing
> Santander Way, 95 Amaral St.
> Riverside, Rhode Island 02915
> Mail Stop: RI 1 EPV 02-15

    You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice no matter how you notify us because it contains important information about your rights.

    If you cancel by mail or telegram, you must send the notice no later than midnight of:  12/23/2017  (or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

### I WISH TO CANCEL

| | | |
|---|---|---|
| Your Signature | Your Name (Please Print) | Date |

### ACKNOWLEDGMENT OF RECEIPT
    By signing below, you acknowledge receiving 2 copies of this Notice of Right to Cancel and a copy of the Truth-In-Lending Disclosures.

████████████

                                       12/20/2017
                                               Date



## NOTICE OF RIGHT TO CANCEL
### (When Opening Home Equity Line Account)

**Your Right to Cancel** account #    ▮3733

We have agreed to establish a Home Equity Line Account for you, and you have agreed to give us a mortgage or deed of trust on your home as security for the Account. You have a legal right under federal law to cancel the account, without cost, within three business days after the latest of the following events:

(1)   the opening date of your Account which is  **12/20/2017**  ; or

(2)   the date you received your Truth in Lending disclosures; or

(3)   the date you received this notice of your right to cancel the account.

### What Happens If You Cancel

If you cancel the account, the mortgage or deed of trust on your home is also cancelled. Within 20 days of receiving your notice, we must take the necessary steps to reflect the fact that the mortgage or deed of trust on your home has been cancelled. We must return to you any money or property you have given to us or to anyone else in connection with the account.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address shown below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

### How to Cancel

If you decide to cancel the account, you may do so by notifying us in writing, at the following address:

> Santander Bank, N.A.
> Home Equity Processing
> Santander Way, 95 Amaral St.
> Riverside, Rhode Island 02915
> Mail Stop: RI 1 EPV 02-15

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice no matter how you notify us because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of:  **12/23/2017** (or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

### I WISH TO CANCEL

_____            _____            _____
Your Signature                                   Your Name (Please Print)                              Date

### ACKNOWLEDGMENT OF RECEIPT

By signing below, you acknowledge receiving 2 copies of this Notice of Right to Cancel and a copy of the Truth-In-Lending Disclosures.

                                                                                    **12/20/2017**
_____                        _____
▮                                                                                                    Date



# MODIFICATION TO HOME EQUITY LINE OF CREDIT AGREEMENT ("MODIFICATION")

Maximum Credit Limit $ ███████          Account No. ███ 3733

██████████

The undersigned, for valuable consideration, do hereby agree to the amendment and modification of only those provisions of the Santander Bank, N.A. Home Equity Line of Credit Agreement ("Agreement") of even date hereof that are specifically referenced below.

**Periodic Finance Charges** - A variable rate, introductory Annual Percentage Rate ( APR ) will apply during the first twenty-four (24) billing cycles after your line is opened ( Introductory Period ). The rate will be based on the U.S. Prime Rate ( Prime ) (4.50% as of 12/15/2017) minus 1.01% or Prime minus .51% for properties located in NY and MD. Prime is based on the published rate in the Money Rates table of The Wall Street Journal on the first business day of the calendar month. Prime may change at any time and is subject to change without notice. If Prime increases or decreases during the Introductory Period, the variable Introductory APR and minimum requirement payment will correspondingly change.

The variable introductory Annual Perce ntage Rate will cease at the end of the twenty-fourth billing cycle after your credit line is opened and the non-introductory variable Annual Percentage Rate will apply to all balances then or thereafter outstanding on your Home Equity Line of Credit.

If ePay is discontinued during the introductory period, the Introductory APR will cease and the applicable non-introductory APR will apply.

The undersigned further agree that this Modification and the terms hereof are hereby incorporated into the Agreement. Except as expressly modified above, all other terms of the Agreement shall remain in full force and effect.

Effective Date 26th day of DECEMBER, 2017

## THE UNDERSIGNED ACKNOWLEDGE RECEIVING A COMPLETED COPY OF THIS MODIFICATION AND AGREE TO ITS TERMS.

_____ (Seal)          _____(Seal)
Borrower                                          Borrower


_____ (Seal)          _____(Seal)
Borrower                                          Borrower


LS4.mdf                                                                        1663269

**CUSTOMER COPY**

# PROHIBITION OF LEASING
# MINERAL, OIL AND GAS RIGHTS

Santander does not make loans secured by properties that are subject to an existing lease, assignment, or transfer of fossil fuel rights, such as mineral, oil, or gas rights. In addition, Borrower hereby acknowledges the restrictions set forth in the Security Instrument, and agrees to refrain from leasing, assigning or transferring such mineral, oil, or gas rights at any time during the time that the loan remains outstanding, as set forth in greater detail below.

- Borrower shall not allow any part of the property described in the Security Instrument, and located at: _____ █████████████████ _____ (the"Property") securing the repayment of the Loan, to be leased, assigned or otherwise transferred for use to extract minerals, oil or gas from said Property, or any adjoining or neighboring properties.

- Borrower shall not allow any surface activity to be permitted to occur on the Property in the furtherance of any such extraction activity on the Property.

- Borrower shall not allow any surface activity to be permitted to occur on the Property in the furtherance of any extraction activity on adjoining or neighboring properties.

- In the event there is an existing lease or similar instrument affecting such transfer of rights, then the Borrower shall take affirmative steps to prevent any renewal or expansion of such prior grant, to the extent possible under the terms of such instrument.

Any violation of this Prohibition shall subject the Borrower, until the violation is cured, to injunctive or equitable relief, to bring the Property back into compliance with this Prohibition, including, but not limited to the payment of reasonable expenses and attorney's fees and costs incurred by the Lender, its successors or assigns, in any successful legal action to obtain such other equitable relief to enforce this Prohibition.

*MOG 02/17*

*@globalAppNo*

# EXHIBIT B

 Santander®

Mail Code: 10-421-CN2
P.O. Box 12646
Reading, PA 19612
Customer Service: 1-877-768-2265
www.SantanderBank.com

**STATEMENT OF ACCOUNT**

| | |
|---|---|
| **Account Number:** | ███3733 |
| Statement Date: | 10-19-2024 |
| Statement Period From: | 09-20-2024 |
| Statement Period Through: | 10-19-2024 |
| Days in Statement Period: | 30 |
| Current Balance: | |
| Credit Line Amount: | ███ |
| Available Credit: | |
| End of Draw Date: | 12-20-2027 |

| | |
|---|---|
| **Minimum Payment:** | |
| **Payment Due Date:** | 11-11-2024 |

2968-0.4200 000003BFXAXO2 1/2 BIN:0 0-11869

---

## Important Message

Want a faster and more convenient way to get your account information?
Enroll in online banking and our Mobile Banking App – it takes just a few minutes.

---

### ACCOUNT BILLING SUMMARY

| | |
|---|---|
| Principal Due | $0.00 |
| **INTEREST CHARGE** Due | ███ |
| Past Due Amount | $0.00 |
| Late Charges Due | $0.00 |
| Fees Due | $0.00 |
| Payment Shortage | $0.00 |
| **Total Minimum Payment Due** | ███ |

### ACCOUNT BALANCE SUMMARY

| | |
|---|---|
| Beginning Balance | ███ |
| Advances | $0.00 |
| Payment Received | ███ |
| Insurance Premium | $0.00 |
| **INTEREST CHARGE** | ███ |
| Late Charges | $0.00 |
| Fees | $0.00 |
| Adjustments | $0.00 |
| Ending Balance | ███ |
| Unapplied Credit Balance | $0.00 |

---

### SUMMARY OF REVOLVING ACCOUNT BALANCE

| | | | |
|---|---|---|---|
| Periodic Rate From | 09-20-2024 | Periodic **INTEREST CHARGE** | ███ |
| Periodic Rate Through | 10-19-2024 | **ANNUAL PERCENTAGE RATE** | 9.0000 |
| Payment Amount | ███ | | |
| Daily Periodic Rate * | 0.0002459016 | | |
| Balance Subject to Interest Rate | ███ | Ending Principal | ███ |

  * The daily periodic rate may vary.

---

### TRANSACTION ACTIVITY SINCE YOUR LAST STATEMENT

| Posting Date | Effective Date | Activity Description | Amount | Balance |
|---|---|---|---|---|
| | 09-20-2024 | BEGINNING PRINCIPAL | | ███ |
| 10-15-2024 | 10-11-2024 | PAYMENT RECEIVED - THANK YOU | ███ | ███ |
| | | ** INTEREST CHARGE ** | | |
| | 10-19-2024 | ENDING PRINCIPAL | | ███ |

**************************************************** **FEES** ****************************************************
TOTAL FEES THIS PERIOD                                                                  $0.00

**************************************************** **INTEREST CHARGED** ****************************************************
TOTAL INTEREST THIS PERIOD                                                              ███

---

Please return this portion with your check.

 Santander®



| Account Number | Due Date | Payment Due | Amount Enclosed |
|---|---|---|---|
| ███3733 | 11-11-2024 | ███ | |

Your Regular Monthly Payment of $1,124.37 and any optional additional amount will be automatically debited from your designated bank account on 11-11-2024, unless you make an early payment. If any amount is past due, you must make separate arrangements to pay that amount.
If applicable, an Annual Fee will be assessed and debited during the statement cycle following the account opening anniversary month.

Make Check Payable To:

Santander Bank, N.A,
P.O. Box 847051
Boston, MA 02284-7051

# EXHIBIT B-1



Mail Code: 10-421-CN2
P.O. Box 12646
Reading, PA 19612
Customer Service: 1-877-768-2265
www.SantanderBank.com

**STATEMENT OF ACCOUNT**

| | |
|---|---|
| **Account Number:** | ███3733 |
| Statement Date: | 11-19-2024 |
| Statement Period From: | 10-20-2024 |
| Statement Period Through: | 11-19-2024 |
| Days in Statement Period: | 31 |
| Current Balance: | ███ |
| Credit Line Amount: | |
| Available Credit: | |
| End of Draw Date: | 12-20-2027 |

| | |
|---|---|
| **Minimum Payment:** | ███ |
| **Payment Due Date:** | 12-12-2024 |

340-0.4200 000003BFXAY6G 1/2 BIN:0 0-1359

---

## Important Message

Want a faster and more convenient way to get your account information?
Enroll in online banking and our Mobile Banking App – it takes just a few minutes.

---

| **ACCOUNT BILLING SUMMARY** | | **ACCOUNT BALANCE SUMMARY** | |
|---|---|---|---|
| Principal Due | $0.00 | Beginning Balance | ███ |
| **INTEREST CHARGE** Due | ███ | Advances | $0.00 |
| Past Due Amount | $0.00 | Payment Received | ███ |
| Late Charges Due | $0.00 | Insurance Premium | $0.00 |
| Fees Due | $0.00 | **INTEREST CHARGE** | ███ |
| Payment Shortage | $0.00 | Late Charges | $0.00 |
| **Total Minimum Payment Due** | ███ | Fees | $0.00 |
| | | Adjustments | $0.00 |
| | | Ending Balance | ███ |
| | | Unapplied Credit Balance | $0.00 |

### SUMMARY OF REVOLVING ACCOUNT BALANCE

| | | | |
|---|---|---|---|
| Periodic Rate From | 10-20-2024 | Periodic **INTEREST CHARGE** | ███ |
| Periodic Rate Through | 11-19-2024 | **ANNUAL PERCENTAGE RATE** | 8.5000 |
| Payment Amount | | | |
| Daily Periodic Rate * | 0.0002322404 | | |
| Balance Subject to Interest Rate | ███ | Ending Principal | ███ |

　　* The daily periodic rate may vary.

### TRANSACTION ACTIVITY SINCE YOUR LAST STATEMENT

| Posting Date | Effective Date | Activity Description | Amount | Balance |
|---|---|---|---|---|
| | 10-20-2024 | BEGINNING PRINCIPAL | | ███ |
| 11-07-2024 | 11-06-2024 | PAYMENT RECEIVED - THANK YOU TO PRINCIPAL | ███ | ███ |
| | | ** INTEREST CHARGE ** | | |
| | 11-19-2024 | ENDING PRINCIPAL | | ███ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* **FEES** \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TOTAL FEES THIS PERIOD                                    $0.00

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* **INTEREST CHARGED** \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TOTAL INTEREST THIS PERIOD                              ███

---

*Please return this portion with your check.*



| Account Number | Due Date | Payment Due | Amount Enclosed |
|---|---|---|---|
| ███3733 | 12-12-2024 | ███ | |



Your Regular Monthly Payment of $1,085.11 and any optional additional amount will be automatically debited from your designated bank account on 12-12-2024, unless you make an early payment. If any amount is past due, you must make separate arrangements to pay that amount.
If applicable, an Annual Fee will be assessed and debited during the statement cycle following the account opening anniversary month.

**Make Check Payable To:**

Santander Bank, N.A,
P.O. Box 847051
Boston, MA 02284-7051

# EXHIBIT C


Santander®

Mail Code: 10-421-CN2
P.O. Box 12646
Reading, PA 19612
Customer Service: 1-877-768-2265
www.SantanderBank.com

**STATEMENT OF ACCOUNT**

| | |
|---|---|
| Account Number: | ■■■3733 |
| Statement Date: | 12-19-2024 |
| Statement Period From: | 11-20-2024 |
| Statement Period Through: | 12-19-2024 |
| Days in Statement Period: | 30 |
| Current Balance: | ■■■ |
| Credit Line Amount: | ■■■ |
| Available Credit: | ■■■ |
| End of Draw Date: | 12-20-2027 |

| | |
|---|---|
| **Minimum Payment:** | ■■■ |
| **Payment Due Date:** | 01-11-2025 |

31-0.4200 000003BFXAYNG 1/2 BIN:0 0-123

---

## Important Message

Want a faster and more convenient way to get your account information?
Enroll in online banking and our Mobile Banking App – it takes just a few minutes.

---

### ACCOUNT BILLING SUMMARY

| | |
|---|---|
| Principal Due | $0.00 |
| **INTEREST CHARGE** Due | ■■■ |
| Past Due Amount | $0.00 |
| Late Charges Due | $0.00 |
| Fees Due | $0.00 |
| Payment Shortage | $0.00 |
| **Total Minimum Payment Due** | ■■■ |

### ACCOUNT BALANCE SUMMARY

| | |
|---|---|
| Beginning Balance | ■■■ |
| Advances | $0.00 |
| Payment Received | ■■■ |
| Insurance Premium | $0.00 |
| **INTEREST CHARGE** | ■■■ |
| Late Charges | $0.00 |
| Fees | $0.00 |
| Adjustments | $0.00 |
| Ending Balance | ■■■ |
| Unapplied Credit Balance | $0.00 |

### SUMMARY OF REVOLVING ACCOUNT BALANCE

| | | | |
|---|---|---|---|
| Periodic Rate From | 11-20-2024 | Periodic **INTEREST CHARGE** | ■■■ |
| Periodic Rate Through | 12-19-2024 | **ANNUAL PERCENTAGE RATE** | 8.5000 |
| Payment Amount | | | |
| Daily Periodic Rate * | 0.0002322404 | | |
| Balance Subject to Interest Rate | ■■■ | Ending Principal | ■■■ |

    * The daily periodic rate may vary.

### TRANSACTION ACTIVITY SINCE YOUR LAST STATEMENT

| Posting Date | Effective Date | Activity Description | Amount | Balance |
|---|---|---|---|---|
| | 11-20-2024 | BEGINNING PRINCIPAL | | ■■■ |
| 12-13-2024 | 12-12-2024 | PAYMENT RECEIVED - THANK YOU | ■■■ | ■■■ |
| | | ** INTEREST CHARGE ** | | |
| | 12-19-2024 | ENDING PRINCIPAL | | ■■■ |

*********************************************** **FEES** ***********************************************

| | |
|---|---|
| TOTAL FEES THIS PERIOD | $0.00 |

*********************************************** **INTEREST CHARGED** ***********************************************

| | |
|---|---|
| TOTAL INTEREST THIS PERIOD | ■■■ |

---

*Please return this portion with your check.*


Santander®



| Account Number | Due Date | Payment Due | Amount Enclosed |
|---|---|---|---|
| ■■■3733 | 01-11-2025 | ■■■ | |

Your Regular Monthly Payment of $1,035.78 and any optional additional amount will be automatically debited from your designated bank account on 01-11-2025, unless you make an early payment. If any amount is past due, you must make separate arrangements to pay that amount.
If applicable, an Annual Fee will be assessed and debited during the statement cycle following the account opening anniversary month.

**Make Check Payable To:**

Santander Bank, N.A,
P.O. Box 847051
Boston, MA 02284-7051

# EXHIBIT D

 **Santander**®

Mail Code: 10-421-CN2
P.O. Box 12646
Reading, PA 19612
Customer Service: 1-877-768-2265
www.SantanderBank.com

## STATEMENT OF ACCOUNT

| | |
|---|---|
| Account Number: | ███3733 |
| Statement Date: | 01-19-2025 |
| Statement Period From: | 12-20-2024 |
| Statement Period Through: | 01-19-2025 |
| Days in Statement Period: | 31 |
| Current Balance: | ███ |
| Credit Line Amount: | ███ |
| Available Credit: | ███ |
| End of Draw Date: | 12-20-2027 |

| | |
|---|---|
| **Minimum Payment:** | ███ |
| **Payment Due Date:** | 02-11-2025 |

1127-0.4200 000003BFXAZ3E 1/2 BIN:0 0-4359

---

## Important Message

Want a faster and more convenient way to get your account information?
Enroll in online banking and our Mobile Banking App – it takes just a few minutes.

---

## ACCOUNT BILLING SUMMARY

| | |
|---|---|
| Principal Due | $0.00 |
| **INTEREST CHARGE** Due | ███ |
| Past Due Amount | $0.00 |
| Late Charges Due | $0.00 |
| Fees Due | $50.00 |
| Payment Shortage | $0.00 |
| **Total Minimum Payment Due** | ███ |

## ACCOUNT BALANCE SUMMARY

| | |
|---|---|
| Beginning Balance | ███ |
| Advances | $0.00 |
| Payment Received | ███ |
| Insurance Premium | $0.00 |
| **INTEREST CHARGE** | ███ |
| Late Charges | $0.00 |
| Fees | $50.00 |
| Adjustments | $0.00 |
| Ending Balance | ███ |
| Unapplied Credit Balance | $0.00 |

### RATE SUMMARY

| Periodic Rate From | Periodic Rate Through | Annual Percentage Rate | Daily Periodic Rate | Balance subject to Interest Rate |
|---|---|---|---|---|
| 12-20-2024 | 12-31-2024 | 8.2500 | 0.0002254098 | ███ |
| 01-01-2025 | 01-19-2025 | 8.2500 | 0.0002260273 | |

### TRANSACTION ACTIVITY SINCE YOUR LAST STATEMENT

| Posting Date | Effective Date | Activity Description | Amount | Balance |
|---|---|---|---|---|
| | 12-20-2024 | BEGINNING PRINCIPAL | | |
| 01-13-2025 | 01-10-2025 | PAYMENT RECEIVED - THANK YOU | ███ | ███ |
| | | ** INTEREST CHARGE ** | | |
| | 01-19-2025 | ENDING PRINCIPAL | | ███ |

********************************************************** **FEES** **********************************************************

| | | | | |
|---|---|---|---|---|
| 01-21-2025 | 01-19-2025 | ANNUAL FEE | | $50.00 |
| | | TOTAL FEES THIS PERIOD | | $50.00 |

********************************************************** **INTEREST CHARGED** **********************************************************

| | | | | |
|---|---|---|---|---|
| | | TOTAL INTEREST THIS PERIOD | | ███ |

---

*Please return this portion with your check.*

 **Santander**®



| Account Number | Due Date | Payment Due | Amount Enclosed |
|---|---|---|---|
| ███3733 | 02-11-2025 | ███ | |

Your Regular Monthly Payment of $1,040.57 and any optional additional amount will be automatically debited from your designated bank account on 02-11-2025, unless you make an early payment. If any amount is past due, you must make separate arrangements to pay that amount.

If applicable, an Annual Fee will be assessed and debited during the statement cycle following the account opening anniversary month.

**Make Check Payable To:**

Santander Bank, N.A,
P.O. Box 847051
Boston, MA 02284-7051



# EXHIBIT D-1

# Santander®

Mail Code: 10-421-CN2
P.O. Box 12646
Reading, PA 19612
Customer Service: 1-877-768-2265
www.SantanderBank.com

**STATEMENT OF ACCOUNT**

88-0.4200 000003BFXAZKI 1/2 BIN:0 0-351

| | |
|---|---|
| **Account Number:** | ███ 3733 |
| Statement Date: | 02-19-2025 |
| Statement Period From: | 01-20-2025 |
| Statement Period Through: | 02-19-2025 |
| Days in Statement Period: | 31 |
| Current Balance: | |
| Credit Line Amount: | ███ |
| Available Credit: | |
| End of Draw Date: | 12-20-2027 |

| | |
|---|---|
| **Minimum Payment:** | |
| **Payment Due Date:** | 03-14-2025 |

## Important Message

Want a faster and more convenient way to get your account information?
Enroll in online banking and our Mobile Banking App – it takes just a few minutes.

### ACCOUNT BILLING SUMMARY

| | |
|---|---|
| Principal Due | $0.00 |
| **INTEREST CHARGE** Due | ███ |
| Past Due Amount | $0.00 |
| Late Charges Due | $0.00 |
| Fees Due | $0.00 |
| Payment Shortage | $0.00 |
| **Total Minimum Payment Due** | ███ |

### ACCOUNT BALANCE SUMMARY

| | |
|---|---|
| Beginning Balance | ███ |
| Advances | $0.00 |
| Payment Received | ███ |
| Insurance Premium | $0.00 |
| **INTEREST CHARGE** | ███ |
| Late Charges | $0.00 |
| Fees | $0.00 |
| Adjustments | $0.00 |
| Ending Balance | ███ |
| Unapplied Credit Balance | $0.00 |

### SUMMARY OF REVOLVING ACCOUNT BALANCE

| | | | |
|---|---|---|---|
| Periodic Rate From | 01-20-2025 | Periodic **INTEREST CHARGE** | ███ |
| Periodic Rate Through | 02-19-2025 | **ANNUAL PERCENTAGE RATE** | 8.0000 |
| Payment Amount | ███ | | |
| Daily Periodic Rate * | 0.0002191781 | | |
| Balance Subject to Interest Rate | ███ | Ending Principal | ███ |

   * The daily periodic rate may vary.

### TRANSACTION ACTIVITY SINCE YOUR LAST STATEMENT

| Posting Date | Effective Date | Activity Description | Amount | Balance |
|---|---|---|---|---|
| | 01-20-2025 | BEGINNING PRINCIPAL | | ███ |
| 02-12-2025 | 02-11-2025 | PAYMENT RECEIVED - THANK YOU | ███ | ███ |
| | | ** INTEREST CHARGE ** | | |
| 02-13-2025 | 02-12-2025 | PAYMENT RECEIVED - THANK YOU | $50.00 | ███ |
| | | ANNUAL FEE | $50.00 | |
| | 02-19-2025 | ENDING PRINCIPAL | | ███ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* **FEES** \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    TOTAL FEES THIS PERIOD                                      $0.00

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* **INTEREST CHARGED** \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    TOTAL INTEREST THIS PERIOD                         ███

Please return this portion with your check.




# Santander®

| Account Number | Due Date | Payment Due | Amount Enclosed |
|---|---|---|---|
| ███ 3733 | 03-14-2025 | ███ | |



Your Regular Monthly Payment of $1,010.10 and any optional additional amount will be automatically debited from your designated bank account on 03-14-2025, unless you make an early payment. If any amount is past due, you must make separate arrangements to pay that amount.
If applicable, an Annual Fee will be assessed and debited during the statement cycle following the account opening anniversary month.

Make Check Payable To:

        Santander Bank, N.A,
        P.O. Box 847051
        Boston, MA 02284-7051

# EXHIBIT E

 **Santander**®

Mail Code: PA-WYO-CN3
P.O. Box 12646
Reading, PA 19612
Customer Service: 1-877-768-2265
www.SantanderBank.com

**STATEMENT OF ACCOUNT**

| | |
|---|---|
| Account Number: | ███3733 |
| Statement Date: | 10-19-2025 |
| Statement Period From: | 09-20-2025 |
| Statement Period Through: | 10-19-2025 |
| Days in Statement Period: | 30 |
| Current Balance: | ███ |
| Credit Line Amount: | ███ |
| Available Credit: | ███ |
| End of Draw Date: | 12-20-2027 |

| | |
|---|---|
| **Minimum Payment:** | ███ |
| **Payment Due Date:** | 11-11-2025 |

## Important Message

Want a faster and more convenient way to get your account information?
Enroll in online banking and our Mobile Banking App – it takes just a few minutes.

### ACCOUNT BILLING SUMMARY

| | |
|---|---|
| Principal Due | $0.00 |
| **INTEREST CHARGE** Due | ███ |
| Past Due Amount | $0.00 |
| Late Charges Due | $0.00 |
| Fees Due | $0.00 |
| Payment Shortage | $0.00 |
| **Total Minimum Payment Due** | ███ |

### ACCOUNT BALANCE SUMMARY

| | |
|---|---|
| Beginning Balance | ███ |
| Advances | $0.00 |
| Payment Received | ███ |
| Insurance Premium | $0.00 |
| **INTEREST CHARGE** | ███ |
| Late Charges | $0.00 |
| Fees | $0.00 |
| Adjustments | $0.00 |
| Ending Balance | ███ |
| Unapplied Credit Balance | $0.00 |

### SUMMARY OF REVOLVING ACCOUNT BALANCE

| | | | |
|---|---|---|---|
| Periodic Rate From | 09-20-2025 | Periodic **INTEREST CHARGE** | ███ |
| Periodic Rate Through | 10-19-2025 | **ANNUAL PERCENTAGE RATE** | 8.0000 |
| Payment Amount | | | |
| Daily Periodic Rate * | 0.0002191781 | | |
| Balance Subject to Interest Rate | ███ | Ending Principal | ███ |

 * The daily periodic rate may vary.

### TRANSACTION ACTIVITY SINCE YOUR LAST STATEMENT

| Posting Date | Effective Date | Activity Description | Amount | Balance |
|---|---|---|---|---|
| | 09-20-2025 | BEGINNING PRINCIPAL | | ███ |
| 10-14-2025 | 10-10-2025 | PAYMENT RECEIVED - THANK YOU | ███ | ███ |
| | | ** INTEREST CHARGE ** | | |
| | 10-19-2025 | ENDING PRINCIPAL | | ███ |

******************************************************** **FEES** ********************************************************

TOTAL FEES THIS PERIOD                                                                     $0.00

******************************************************** **INTEREST CHARGED** ********************************************************

TOTAL INTEREST THIS PERIOD                                                            ███

---

*Please return this portion with your check.*

 **Santander**®

| Account Number | Due Date | Payment Due | Amount Enclosed |
|---|---|---|---|
| ███3733 | 11-11-2025 | ███ | |



Your Regular Monthly Payment of $878.89 and any optional additional amount will be automatically debited from your designated bank account on 11-11-2025, unless you make an early payment. If any amount is past due, you must make separate arrangements to pay that amount.
If applicable, an Annual Fee will be assessed and debited during the statement cycle following the account opening anniversary month.

**Make Check Payable To:**

Santander Bank, N.A,
P.O. Box 847051
Boston, MA 02284-7051

# EXHIBIT F



Mail Code: PA-WYO-CN3
P.O. Box 12646
Reading, PA 19612
Customer Service: 1-877-768-2265
www.SantanderBank.com

862-0.4200 000003BFXB3TI 1/2 BIN:0 0-3447

**STATEMENT OF ACCOUNT**

| | |
|---|---|
| **Account Number:** | ████ 3733 |
| Statement Date: | 11-19-2025 |
| Statement Period From: | 10-20-2025 |
| Statement Period Through: | 11-19-2025 |
| Days in Statement Period: | 31 |
| Current Balance: | ████ |
| Credit Line Amount: | ████ |
| Available Credit: | ████ |
| End of Draw Date: | 12-20-2027 |
| **Minimum Payment:** | ████ |
| **Payment Due Date:** | 12-12-2025 |

---

## Important Message

Want a faster and more convenient way to get your account information?
Enroll in online banking and our Mobile Banking App – it takes just a few minutes.

---

### ACCOUNT BILLING SUMMARY

| | |
|---|---|
| Principal Due | $0.00 |
| **INTEREST CHARGE** Due | ████ |
| Past Due Amount | $0.00 |
| Late Charges Due | $0.00 |
| Fees Due | $0.00 |
| Payment Shortage | $0.00 |
| **Total Minimum Payment Due** | ████ |

### ACCOUNT BALANCE SUMMARY

| | |
|---|---|
| Beginning Balance | ████ |
| Advances | $0.00 |
| Payment Received | ████ |
| Insurance Premium | $0.00 |
| **INTEREST CHARGE** | ████ |
| Late Charges | $0.00 |
| Fees | $0.00 |
| Adjustments | $0.00 |
| Ending Balance | ████ |
| Unapplied Credit Balance | $0.00 |

---

### SUMMARY OF REVOLVING ACCOUNT BALANCE

| | | | |
|---|---|---|---|
| Periodic Rate From | 10-20-2025 | Periodic **INTEREST CHARGE** | ████ |
| Periodic Rate Through | 11-19-2025 | **ANNUAL PERCENTAGE RATE** | 7.7500 |
| Payment Amount | | | |
| Daily Periodic Rate * | 0.0002123288 | | |
| Balance Subject to Interest Rate | ████ | Ending Principal | ████ |

    * The daily periodic rate may vary.

---

### TRANSACTION ACTIVITY SINCE YOUR LAST STATEMENT

| Posting Date | Effective Date | Activity Description | Amount | Balance |
|---|---|---|---|---|
| | 10-20-2025 | BEGINNING PRINCIPAL | | ████ |
| 11-12-2025 | 11-10-2025 | PAYMENT RECEIVED - THANK YOU | ████ | |
| | | ** INTEREST CHARGE ** | | |
| | 11-19-2025 | ENDING PRINCIPAL | | ████ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* **FEES** \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| TOTAL FEES THIS PERIOD | $0.00 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* **INTEREST CHARGED** \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| TOTAL INTEREST THIS PERIOD | ████ |

---

*Please return this portion with your check.*



| Account Number | Due Date | Payment Due | Amount Enclosed |
|---|---|---|---|
| ████ 3733 | 12-12-2025 | ████ | |

Your Regular Monthly Payment of $879.81 and any optional additional amount will be automatically debited from your designated bank account on 12-12-2025, unless you make an early payment. If any amount is past due, you must make separate arrangements to pay that amount.
If applicable, an Annual Fee will be assessed and debited during the statement cycle following the account opening anniversary month.



**Make Check Payable To:**

Santander Bank, N.A,
P.O. Box 847051
Boston, MA 02284-7051

# EXHIBIT F-1

# Santander®

Mail Code: PA-WYO-CN3
P.O. Box 12646
Reading, PA 19612
Customer Service: 1-877-768-2265
www.SantanderBank.com

1744-0.4200 000003BFXB4A6 1/2 BIN:0 0-6975

## STATEMENT OF ACCOUNT

| Account Number: | ████733 |
|---|---|
| Statement Date: | 12-19-2025 |
| Statement Period From: | 11-20-2025 |
| Statement Period Through: | 12-19-2025 |
| Days in Statement Period: | 30 |
| Current Balance: | |
| Credit Line Amount: | |
| Available Credit: | |
| End of Draw Date: | 12-20-2027 |

| Minimum Payment: | |
|---|---|
| Payment Due Date: | 01-11-2026 |

---

## Important Message

Want a faster and more convenient way to get your account information?
Enroll in online banking and our Mobile Banking App – it takes just a few minutes.

---

| ACCOUNT BILLING SUMMARY | |
|---|---|
| Principal Due | $0.00 |
| **INTEREST CHARGE** Due | ██ |
| Past Due Amount | $0.00 |
| Late Charges Due | $0.00 |
| Fees Due | $0.00 |
| Payment Shortage | $0.00 |
| **Total Minimum Payment Due** | ██ |

| ACCOUNT BALANCE SUMMARY | |
|---|---|
| Beginning Balance | ██ |
| Advances | $0.00 |
| Payment Received | ██ |
| Insurance Premium | $0.00 |
| **INTEREST CHARGE** | ██ |
| Late Charges | $0.00 |
| Fees | $0.00 |
| Adjustments | $0.00 |
| Ending Balance | ██ |
| Unapplied Credit Balance | $0.00 |

## SUMMARY OF REVOLVING ACCOUNT BALANCE

| | | | |
|---|---|---|---|
| Periodic Rate From | 11-20-2025 | Periodic **INTEREST CHARGE** | ██ |
| Periodic Rate Through | 12-19-2025 | **ANNUAL PERCENTAGE RATE** | 7.5000 |
| Payment Amount | | | |
| Daily Periodic Rate * | 0.0002054795 | | |
| Balance Subject to Interest Rate | ██ | Ending Principal | ██ |

&ast; The daily periodic rate may vary.

## TRANSACTION ACTIVITY SINCE YOUR LAST STATEMENT

| Posting Date | Effective Date | Activity Description | Amount | Balance |
|---|---|---|---|---|
| | 11-20-2025 | BEGINNING PRINCIPAL | | ██ |
| 12-15-2025 | 12-12-2025 | PAYMENT RECEIVED - THANK YOU | ██ | ██ |
| | | ** INTEREST CHARGE ** | | |
| | 12-19-2025 | ENDING PRINCIPAL | | ██ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* **FEES** \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| TOTAL FEES THIS PERIOD | $0.00 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* **INTEREST CHARGED** \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| TOTAL INTEREST THIS PERIOD | ██ |

---

*Please return this portion with your check.*

# Santander®





| Account Number | Due Date | Payment Due | Amount Enclosed |
|---|---|---|---|
| ████3733 | 01-11-2026 | ██ | |

Your Regular Monthly Payment of $823.96 and any optional additional amount will be automatically debited from your designated bank account on 01-11-2026, unless you make an early payment. If any amount is past due, you must make separate arrangements to pay that amount.
If applicable, an Annual Fee will be assessed and debited during the statement cycle following the account opening anniversary month.

**Make Check Payable To:**

Santander Bank, N.A,
P.O. Box 847051
Boston, MA 02284-7051

# EXHIBIT G

# Santander®

Mail Code: PA-WYO-CN3
P.O. Box 12646
Reading, PA 19612
Customer Service: 1-877-768-2265
www.SantanderBank.com

2958-0.4200 000003BFXB4OG 1/2 BIN:0 0-11831

**STATEMENT OF ACCOUNT**

| | |
|---|---|
| Account Number: | ▮3733 |
| Statement Date: | 01-19-2026 |
| Statement Period From: | 12-20-2025 |
| Statement Period Through: | 01-19-2026 |
| Days in Statement Period: | 31 |
| Current Balance: | |
| Credit Line Amount: | |
| Available Credit: | |
| End of Draw Date: | 12-20-2027 |

| | |
|---|---|
| **Minimum Payment:** | |
| **Payment Due Date:** | 02-11-2026 |

---

## Important Message

Want a faster and more convenient way to get your account information?
Enroll in online banking and our Mobile Banking App – it takes just a few minutes.

---

### ACCOUNT BILLING SUMMARY

| | |
|---|---|
| Principal Due | $0.00 |
| **INTEREST CHARGE** Due | |
| Past Due Amount | $0.00 |
| Late Charges Due | $0.00 |
| Fees Due | $50.00 |
| Payment Shortage | $0.00 |
| **Total Minimum Payment Due** | |

### ACCOUNT BALANCE SUMMARY

| | |
|---|---|
| Beginning Balance | |
| Advances | |
| Payment Received | |
| Insurance Premium | $0.00 |
| **INTEREST CHARGE** | |
| Late Charges | $0.00 |
| Fees | |
| Adjustments | $0.00 |
| Ending Balance | |
| Unapplied Credit Balance | $0.00 |

---

### SUMMARY OF REVOLVING ACCOUNT BALANCE

| | | | |
|---|---|---|---|
| Periodic Rate From | 12-20-2025 | Periodic **INTEREST CHARGE** | |
| Periodic Rate Through | 01-19-2026 | **ANNUAL PERCENTAGE RATE** | 7.5000 |
| Payment Amount | | | |
| Daily Periodic Rate * | 0.0002054795 | | |
| Balance Subject to Interest Rate | | Ending Principal | |

   * The daily periodic rate may vary.

---

### TRANSACTION ACTIVITY SINCE YOUR LAST STATEMENT

| Posting Date | Effective Date | Activity Description | Amount | Balance |
|---|---|---|---|---|
| | 12-20-2025 | BEGINNING PRINCIPAL | | |
| 12-23-2025 | 12-23-2025 | PAYMENT RECEIVED - THANK YOU TO PRINCIPAL | | |
| | | ** INTEREST CHARGE ** | | |
| 01-02-2026 | 01-02-2026 | ADVANCE - FUNDS TRANSFER | | |
| 01-13-2026 | 01-13-2026 | PAYMENT RECEIVED - THANK YOU TO PRINCIPAL | | |
| | 01-19-2026 | ENDING PRINCIPAL | | |

**************************************************************** **FEES** ****************************************************************

| Posting Date | Effective Date | Activity Description | Amount |
|---|---|---|---|
| 01-20-2026 | 01-19-2026 | ANNUAL FEE | |
| | | TOTAL FEES THIS PERIOD | |

---

*Please return this portion with your check.*

# Santander®




| Account Number | Due Date | Payment Due | Amount Enclosed |
|---|---|---|---|
| ▮3733 | 02-11-2026 | | |

Your Regular Monthly Payment of $609.59 and any optional additional amount will be automatically debited from your designated bank account on 02-11-2026, unless you make an early payment. If any amount is past due, you must make separate arrangements to pay that amount.
If applicable, an Annual Fee will be assessed and debited during the statement cycle following the account opening anniversary month.

**Make Check Payable To:**

Santander Bank, N.A,
P.O. Box 847051
Boston, MA 02284-7051

# EXHIBIT G-1

# Santander®

Mail Code: PA-WYO-CN3
P.O. Box 12646
Reading, PA 19612
Customer Service: 1-877-768-2265
www.SantanderBank.com

**STATEMENT OF ACCOUNT**

| | |
|---|---|
| **Account Number:** | ████3733 |
| Statement Date: | 02-19-2026 |
| Statement Period From: | 01-20-2026 |
| Statement Period Through: | 02-19-2026 |
| Days in Statement Period: | 31 |
| Current Balance: | ████ |
| Credit Line Amount: | ████ |
| Available Credit: | ████ |
| End of Draw Date: | 12-20-2027 |

| | |
|---|---|
| **Minimum Payment:** | ████ |
| **Payment Due Date:** | 03-14-2026 |

596-0.4200 000003BFXB55U 1/2 BIN:0 0-2383

---

## Important Message

Want a faster and more convenient way to get your account information?
Enroll in online banking and our Mobile Banking App – it takes just a few minutes.

---

### ACCOUNT BILLING SUMMARY

| | |
|---|---|
| Principal Due | $0.00 |
| **INTEREST CHARGE** Due | ████ |
| Past Due Amount | $0.00 |
| Late Charges Due | $0.00 |
| Fees Due | $0.00 |
| Payment Shortage | $0.00 |
| **Total Minimum Payment Due** | ████ |

### ACCOUNT BALANCE SUMMARY

| | |
|---|---|
| Beginning Balance | ████ |
| Advances | $0.00 |
| Payment Received | ████ |
| Insurance Premium | $0.00 |
| **INTEREST CHARGE** | ████ |
| Late Charges | $0.00 |
| Fees | $0.00 |
| Adjustments | $0.00 |
| Ending Balance | ████ |
| Unapplied Credit Balance | $0.00 |

### SUMMARY OF REVOLVING ACCOUNT BALANCE

| | | | |
|---|---|---|---|
| Periodic Rate From | 01-20-2026 | Periodic **INTEREST CHARGE** | ████ |
| Periodic Rate Through | 02-19-2026 | **ANNUAL PERCENTAGE RATE** | 7.2500 |
| Payment Amount | | | |
| Daily Periodic Rate * | 0.0001986301 | | |
| Balance Subject to Interest Rate | ████ | Ending Principal | ████ |

    * The daily periodic rate may vary.

### TRANSACTION ACTIVITY SINCE YOUR LAST STATEMENT

| Posting Date | Effective Date | Activity Description | Amount | Balance |
|---|---|---|---|---|
| | 01-20-2026 | BEGINNING PRINCIPAL | | ████ |
| 02-12-2026 | 02-11-2026 | PAYMENT RECEIVED - THANK YOU | ████ | ████ |
| | | ** INTEREST CHARGE ** | | |
| 02-13-2026 | 02-12-2026 | PAYMENT RECEIVED - THANK YOU | $50.00 | ████ |
| | | ANNUAL FEE | $50.00 | |
| | 02-19-2026 | ENDING PRINCIPAL | | ████ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* **FEES** \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| TOTAL FEES THIS PERIOD | $0.00 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* **INTEREST CHARGED** \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| TOTAL INTEREST THIS PERIOD | ████ |

---

*Please return this portion with your check.*

# Santander®




| Account Number | Due Date | Payment Due | Amount Enclosed |
|---|---|---|---|
| ████3733 | 03-14-2026 | ████ | |

Your Regular Monthly Payment of $212.36 and any optional additional amount will be automatically debited from your designated bank account on 03-14-2026, unless you make an early payment. If any amount is past due, you must make separate arrangements to pay that amount.
If applicable, an Annual Fee will be assessed and debited during the statement cycle following the account opening anniversary month.

**Make Check Payable To:**

Santander Bank, N.A,
P.O. Box 847051
Boston, MA 02284-7051

# EXHIBIT H

# Santander Bank Lowers Its Prime Rate to 8.00%

BOSTON, September 18, 2024 – Santander Bank, N.A. announced today it has lowered its prime rate from 8.50% to 8.00% effective September 18, 2024.

**Santander Bank, N.A.** is one of the country's leading retail and commercial banks, with $102 billion in assets. With its corporate offices in Boston, the Bank's more than 5,100 employees and more than 1.8 million customers are principally located in Massachusetts, New Hampshire, Connecticut, Rhode Island, New York, New Jersey, Pennsylvania and Delaware. The Bank is a wholly-owned subsidiary of Madrid-based Banco Santander, S.A. (NYSE: SAN), recognized as one of the world's most admired companies by *Fortune Magazine* in 2024, with approximately 168 million customers in the U.S., Europe, and Latin America. It is overseen by Santander Holdings USA, Inc., Banco Santander's intermediate holding company in the U.S. For more information on Santander Bank, please visit [www.santanderbank.com](www.santanderbank.com).

MEDIA CONTACTS:
Caroline Connolly
[caroline.connolly@santander.us](mailto:caroline.connolly@santander.us)

###

# EXHIBIT I

# Santander Bank Lowers Its Prime Rate to 7.75%

BOSTON, November 7, 2024 – Santander Bank, N.A. announced today it has lowered its prime rate from 8.00% to 7.75% effective November 7, 2024.

**Santander Bank, N.A.** is one of the country's leading retail and commercial banks, with $102 billion in assets. With its corporate offices in Boston, the Bank's more than 5,100 employees and more than 1.8 million customers are principally located in Massachusetts, New Hampshire, Connecticut, Rhode Island, New York, New Jersey, Pennsylvania and Delaware. The Bank is a wholly-owned subsidiary of Madrid-based Banco Santander, S.A. (NYSE: SAN), recognized as one of the world's most admired companies by *Fortune Magazine* in 2024, with approximately 171 million customers in the U.S., Europe, and Latin America. It is overseen by Santander Holdings USA, Inc., Banco Santander's intermediate holding company in the U.S. For more information on Santander Bank, please visit [www.santanderbank.com](www.santanderbank.com).

**MEDIA CONTACTS:**
Caroline Connolly
[caroline.connolly@santander.us](mailto:caroline.connolly@santander.us)

###

# EXHIBIT J



# Santander Bank Lowers Its Prime Rate to 7.50%

BOSTON, December 18, 2024 – Santander Bank, N.A. announced today it has lowered its prime rate from 7.75% to 7.50% effective December 18, 2024.

**Santander Bank, N.A.** is one of the country's leading retail and commercial banks, with $102 billion in assets. With its corporate offices in Boston, the Bank's more than 5,100 employees and more than 1.8 million customers are principally located in Massachusetts, New Hampshire, Connecticut, Rhode Island, New York, New Jersey, Pennsylvania and Delaware. The Bank is a wholly-owned subsidiary of Madrid-based Banco Santander, S.A. (NYSE: SAN), recognized as one of the world's most admired companies by *Fortune Magazine* in 2024, with approximately 171 million customers in the U.S., Europe, and Latin America. It is overseen by Santander Holdings USA, Inc., Banco Santander's intermediate holding company in the U.S. For more information on Santander Bank, please visit www.santanderbank.com.

MEDIA CONTACTS:
Caroline Connolly
caroline.connolly@santander.us

###

# EXHIBIT K

# Santander Bank Lowers Its Prime Rate to 7.25%

BOSTON, September 17, 2025 – Santander Bank, N.A. announced today it has lowered its prime rate from 7.50% to 7.25% effective September 17, 2025.

**Santander Bank, N.A.** is one of the country's leading retail and commercial banks, with $102 billion in assets as of December 31, 2024. With its corporate offices in Boston, the Bank's more than 4,400 employees and more than 1.8 million customers are principally located in Massachusetts, New Hampshire, Connecticut, Rhode Island, New York, New Jersey, Pennsylvania, Delaware and Florida. The Bank is a wholly-owned subsidiary of Madrid-based Banco Santander, S.A. (NYSE: SAN), recognized as one of the world's most admired companies by *Fortune Magazine* in 2025, with approximately 176 million customers in the U.S., Europe, and Latin America. Santander Bank is overseen by Santander Holdings USA, Inc., Banco Santander's intermediate holding company in the U.S. For more information on Santander Bank, please visit [www.santanderbank.com](http://www.santanderbank.com).

**MEDIA CONTACTS:**
Caroline Connolly
[caroline.connolly@santander.us](mailto:caroline.connolly@santander.us)

# EXHIBIT L

# Santander Bank Lowers Its Prime Rate to 7.00%

BOSTON, October 29, 2025 – Santander Bank, N.A. announced today it has lowered its prime rate from 7.25% to 7.00% effective October 29, 2025.

**Santander Bank, N.A.** is one of the country's leading retail and commercial banks, with $102 billion in assets as of December 31, 2024. With its corporate offices in Boston, the Bank's more than 4,400 employees and more than 1.8 million customers are principally located in Massachusetts, New Hampshire, Connecticut, Rhode Island, New York, New Jersey, Pennsylvania, Delaware and Florida. The Bank is a wholly-owned subsidiary of Madrid-based Banco Santander, S.A. (NYSE: SAN), recognized as one of the world's most admired companies by *Fortune Magazine* in 2025, with approximately 178 million customers in the U.S., Europe, and Latin America. Santander Bank is overseen by Santander Holdings USA, Inc., Banco Santander's intermediate holding company in the U.S. For more information on Santander Bank, please visit www.santanderbank.com.

**MEDIA CONTACTS:**
Andrew Simonelli
andrew.simonelli@santander.us

# EXHIBIT M

# Santander Bank Lowers Its Prime Rate to 6.75%

BOSTON, December 10, 2025 – Santander Bank, N.A. announced today it has lowered its prime rate from 7.00% to 6.75% effective December 10, 2025.

**Santander Bank, N.A.** is one of the country's leading retail and commercial banks, with $102 billion in assets as of December 31, 2024. With its corporate offices in Boston, the Bank's more than 4,400 employees and more than 1.8 million customers are principally located in Massachusetts, New Hampshire, Connecticut, Rhode Island, New York, New Jersey, Pennsylvania, Delaware and Florida. The Bank is a wholly-owned subsidiary of Madrid-based Banco Santander, S.A. (NYSE: SAN), recognized as one of the world's most admired companies by *Fortune Magazine* in 2025, with approximately 178 million customers in the U.S., Europe, and Latin America. Santander Bank is overseen by Santander Holdings USA, Inc., Banco Santander's intermediate holding company in the U.S. For more information on Santander Bank, please visit [www.santanderbank.com](www.santanderbank.com).

**MEDIA CONTACTS:**
Andrew Simonelli
andrew.simonelli@santander.us